# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 2, 2011 Session

## TINA MARIE HODGE v. CHADWICK CRAIG

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Maury County**
**No. 00-699     Jim T. Hamilton, Chancellor**

---

**No. M2009-00930-SC-R11-CV - Filed October 1, 2012**

---

This appeal requires the Court to determine whether current Tennessee law permits the former husband of a child's mother to pursue a claim against his former spouse for intentional or negligent misrepresentation regarding the identity of the child's biological father. Following the dissolution of their nine-year marriage, the former husband of the child's mother discovered that he was not the child's biological father. He filed suit against the child's mother in the Chancery Court for Maury County, alleging that she had intentionally misled him into believing that he was the child's biological father. Following a bench trial, the trial court found that the mother's former husband had proved that his former wife had intentionally misrepresented the parentage of the child and awarded him $134,877.90 in compensatory damages for the child support, medical expenses, and insurance premiums he had paid following the divorce, emotional distress, and attorney's fees. The child's mother appealed. Even though the Court of Appeals determined that the evidence supported the trial court's finding that the child's mother had intentionally misrepresented the identity of the child's biological father, it (1) reversed the damage award based on the post-divorce payments for child support, medical expenses, and insurance expenses on the ground that these damages amounted to a prohibited retroactive modification of a child support order, (2) reversed the damage award for emotional distress, and (3) reversed the award for attorney's fees. *Hodge v. Craig*, No. M2009-00930-COA-R3-CV, 2010 WL 4024990, at *12 (Tenn. Ct. App. Oct. 13, 2010). The former husband filed an application for permission to appeal arguing that Tennessee should permit recovery in cases of this sort for intentional or negligent misrepresentation of a child's paternity. We have determined that the existing common-law action for intentional misrepresentation encompasses the claims made in this case by the former husband and that the trial court's damage award based on the former husband's post-divorce payments for child support, medical expenses, and insurance premiums is not an improper retroactive modification of the former husband's child support obligation.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed in Part and Affirmed in Part and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

J. Russell Parkes, Wesley Mack Bryant, and Charles M. Molder, Columbia, Tennessee, for the appellant, Chadwick Craig.

L. Samuel Patterson, Jr., Columbia, Tennessee, for the appellee, Tina Marie Hodge.

**OPINION**

**I.**

Chadwick Craig and Tina Marie Hodge met in a Future Farmers of America class at Mt. Pleasant High School. They were both sixteen years old and in the eleventh grade. Despite her youth, Ms. Hodge had already given birth to a daughter who was almost one year old when Ms. Hodge met Mr. Craig. Mr. Craig and Ms. Hodge dated on and off through the remainder of high school, although Ms. Hodge later characterized their relationship as "more on than . . . off." They were sexually intimate in this relationship.

Ms. Hodge broke up with Mr. Craig for several weeks during early October 1991. During this hiatus, Ms. Hodge had sexual relations with Joey Hay. At one point Ms. Hodge believed that she was pregnant with Mr. Hay's child. However, after a negative pregnancy test, she told Mr. Hay that she was not pregnant. Ms. Hodge returned to Mr. Craig following her liaison with Mr. Hay, but she never told Mr. Craig that she had been intimate with Mr. Hay. Accordingly, by her own admission, Ms. Hodge had sexual relations with both Mr. Hay and Mr. Craig during the period when her son was conceived.

In early November 1991, Ms. Hodge told Mr. Craig that she believed she was pregnant. Mr. Craig suggested a pregnancy test and accompanied Ms. Hodge to her physician's office when the test was performed. After Ms. Hodge informed him that the test confirmed that she was pregnant, Mr. Craig, seeking reassurance, asked Ms. Hodge if she was sure that he was the child's father. Ms. Hodge responded that she was sure that he was the child's father and that the child could be no one else's. Based on these assurances, Mr. Craig proposed marriage to Ms. Hodge, and they were married on December 20, 1991. Ms. Hodge gave birth to a son named Kyle Chandler Craig on June 11, 1992.

Mr. Craig raised Kyle believing him to be his biological son. He also adopted Ms. Hodge's daughter. In 1999, Mr. Craig had a vasectomy after he and Ms. Hodge decided that they did not desire more children. In October 2000, Mr. Craig took a job as an over-the-road truck driver to better support his family. Several weeks later, Ms. Hodge informed him that she was having an adulterous affair with Nicky Hodge who, at that time, was married to another woman.

Ms. Hodge and Mr. Craig separated. In November 2000, Ms. Hodge filed a complaint in the Chancery Court for Maury County seeking a divorce on the ground of irreconcilable differences. The trial court entered a final divorce decree in February 2001 that incorporated the parties' marital dissolution agreement. The agreement provided that Mr. Craig and Ms. Hodge would have joint custody of the children and that Ms. Hodge would be the primary residential parent. Mr. Craig received visitation and was ordered to pay Ms. Hodge $250 per week in child support for both children and to provide medical insurance for the children.

In January 2002, Ms. Hodge married Mr. Hodge. Eleven months later, Mr. Craig met Autumn West, who lived in Bowman, Georgia with her daughter by a previous marriage. Mr. Craig and Ms. West became engaged in March 2003. Mr. Craig moved to Georgia in April or May 2003, and he and Ms. West were married in June 2003. In October 2003, Mr. Craig requested the trial court to decrease the amount of his child support because the move to Georgia had required him to take a lower paying job. Following a hearing in December 2003, the trial court entered an order in July 2004, reducing Mr. Craig's child support to $180 per week and relieving him of the responsibility to provide medical insurance for the children.

Mr. Craig faithfully paid his child support and regularly traveled to Tennessee to visit Kyle and his adopted daughter. Eventually, Kyle expressed a desire to live with Mr. Craig and his new family. Mr. Craig moved back to Maury County rather than uproot Kyle, and in January 2005, the trial court approved a modified parenting plan designating Mr. Craig as Kyle's primary residential parent and Ms. Hodge as her daughter's primary residential parent. Following the entry of this order, Ms. Hodge began paying child support to Mr. Craig.

Mr. Craig and his new wife discussed having another child and on two occasions talked with a physician about reversing his 1999 vasectomy. After considering the cost of the procedure, the likelihood that the procedure would be unsuccessful, and the fact that Mr. Craig already had a son to carry on the family name, they decided not to have the procedure.

At some point during 2006 or 2007, Mr. Craig began to question whether he was Kyle's biological father. His doubts sprang from his belief that Kyle did not resemble him, comments made by others in the community, and an off-hand comment made by Kyle

following a visitation with Ms. Hodge. In February 2007, Mr. Craig surreptitiously obtained a DNA sample from Kyle while he was sleeping and submitted the sample for testing. The test confirmed that Mr. Craig was not Kyle's biological father.

Mr. Craig was unsure about the course of action to take after receiving the news that he was not Kyle's biological father. Initially, he decided to tell no one about the test and to continue to treat Kyle as his child. However, in March 2007, after Kyle expressed a desire to live with Ms. Hodge, Mr. Craig decided to tell Ms. Hodge and Kyle about the test.

When Mr. Craig told Ms. Hodge about the test results, she told him that he was "crazy" and insisted on another test. Mr. Craig suggested that it would be helpful to consult a counselor about how best to break the news to Kyle. However, Ms. Hodge decided that she should be the one to tell Kyle that Mr. Craig was not his biological father. Accordingly, Ms. Hodge told Kyle that Mr. Craig was not his biological father.

Kyle was understandably "shocked and confused and very upset" after Ms. Hodge informed him that Mr. Craig was not his biological father. Even though Mr. Craig expressed his desire to continue their relationship as before, Kyle told him that "it's not the same now" and that he wanted to live with Ms. Hodge. Later, Kyle said he would be willing to visit Mr. Craig but that he did not want to have anything to do with Mr. Craig's new wife. As a result, Mr. Craig and Kyle have had little interaction since Kyle learned that Mr. Craig was not his biological father.

In April 2007, Ms. Hodge filed a pro se petition requesting custody of Kyle, a court-ordered blood test, and a modification of the order requiring her to pay child support. Ms. Hodge represented herself at the June 29, 2007 hearing on her motion. After the parties acknowledged in open court that Mr. Craig was not Kyle's biological father, the trial court entered an order on July 16, 2007, that, among other things, (1) returned Kyle to Ms. Hodge's custody, (2) terminated Ms. Hodge's child support obligation, and (3) reserved all other matters "including the filing of a [c]ounter [c]laim for a separate and distinct cause of action which may be filed on behalf of Chadwick Bradley Craig against Tina Marie Hodge."

In February 2008, Mr. Craig filed a "counter-petition" alleging that Ms. Hodge told him that she was sure that the baby [Kyle] was his and that "the baby could be no one else's" when she knew or should have known that he was not the child's biological father. Based on these "intentional and or negligent misrepresentation[s]," Mr. Craig sought $150,000 in compensatory damages and $150,000 in punitive damages. Ms. Hodge retained an attorney and filed an answer on March 13, 2008. The answer raised no affirmative defenses but denied that Mr. Craig asked Ms. Hodge in November 1991 to confirm that he was Kyle's father or that she ever had any reason to believe that Mr. Craig was not her child's father.

Mr. Craig, Ms. Hodge, and Kyle testified at the bench trial on March 24, 2009. Mr. Craig testified that he would not have proposed to or married Ms. Hodge, that he would not have adopted Ms. Hodge's daughter, and that he would not have undergone a vasectomy had he known that there was a possibility that another man was Kyle's father. For her part, Ms. Hodge testified that she did not intend to mislead Mr. Craig about her son's parentage and that she believed at the time that Mr. Craig was her son's father. She also stated that she would not have married Mr. Craig had she known that he was not her son's father. Kyle testified that he was not interested in seeing Mr. Craig "at this moment."

In its order filed on April 3, 2009, the trial court observed that Ms. Hodge's "credibility . . . leaves much to be desired." The court also found that Ms. Hodge "knew that she and Joey Hay had sex and she knew there was a possibility that Joey Hay was the father of this unborn child." In addition, the court found that "[t]he fact that [Ms. Hodge] did not tell [Mr. Craig] about her sex with Joey Hay and allowed [Mr. Craig] to do the things he did after being told he was the father clearly shows her fraudulent intent to deceive [Mr. Craig] into thinking he was the father."

Based on these factual findings, the trial court concluded that Ms. Hodge "purposely defrauded [Mr. Craig] into believing Kyle was his child, knowing she had sexual relations with Joey Hay at the time and a count on one's fingers would have revealed Joey Hay could be the father." As a result of Ms. Hodge's misrepresentation and failure to disclose a material fact, the trial court also concluded that she "practiced . . . fraud, misrepresentation and failure to disclose a material fact from December 20, 1991 when they married until their divorce February 9, 2001."

After concluding that Ms. Hodge's conduct amounted to "fraud, intentional misrepresentation, [and] negligent misrepresentation," the trial court awarded Mr. Craig $23,030.24, "representing the total child support paid by Chadwick Bradley Craig," $2,214.20, "representing medical expenses and insurance premiums paid by Chadwick Bradley Craig," and $1,181.75 "for TRH Health Plans."[1] The court also awarded Mr. Craig $100,000.00 "for the emotional distress suffered" and $8,451.71 in attorney's fees.

Ms. Hodge perfected an appeal. She raised three issues in the brief and supplemental brief she filed with the Court of Appeals. First, she asserted that the damage award based on Mr. Craig's child support payments, medical expenses, and insurance premiums was a

---

[1]We note that the trial court's damage award actually double counted the $1,181.75 in health insurance premiums that Mr. Craig had paid. Exhibit 4 introduced by Mr. Craig reflects that the $1,181.75 in premiums paid to TRH was included in the $2,214.20 he claimed for both insurance premiums and medical expenses.

retroactive modification of child support that was prohibited by Tenn. Code Ann. § 36-5-101(f)(1) (2010 & Supp. 2011), as construed by *Rutledge v. Barrett*, 802 S.W.2d 604, 607 (Tenn. 1991). Second, she argued that the facts did not support the trial court's finding that she engaged in fraud or misrepresentation. Third, she insisted that the $100,000 award for emotional distress was speculative because Mr. Craig had failed to prove that he had suffered a mental injury.

The Court of Appeals handed down its opinion on October 13, 2010. *Hodge v. Craig*, No. M2009-00930-COA-R3-CV, 2010 WL 4024990 (Tenn. Ct. App. Oct. 13, 2010). After giving appropriate deference to the trial court's assessment of Ms. Hodge's credibility, the appellate court found "that a preponderance of the evidence supports the trial court's finding that [Ms. Hodge] made an intentional misrepresentation to [Mr. Craig] that the child she was carrying was his and could have been fathered by no one else but him." *Hodge v. Craig*, 2010 WL 4024990, at *7. However, the appellate court reversed the damage award for child support, medical expenses, and insurance premiums because it amounted to retroactive modification of the earlier child support order. *Hodge v. Craig*, 2010 WL 4024990, at *9. It likewise reversed the $100,000 damage award for emotional distress based on its conclusion that noneconomic damages could not be awarded for a misrepresentation claim. *Hodge v. Craig*, 2010 WL 4024990, at *12. Finally, the appellate court vacated the award of attorney's fees because it had reversed all the other compensatory damage awards. *Hodge v. Craig*, 2010 WL 4024990, at *12.

The Court of Appeals concluded its opinion by noting that the parties had presented decisions from other states construing claims for "paternity fraud." While the court found that these cases presented "important considerations," it declined to recognize a cause of action for paternity fraud, *Hodge v. Craig*, 2010 WL 4024990, at *12, and also declined to address whether an award for compensatory damages for pecuniary loss not related to child support could be awarded or whether Mr. Craig would have been entitled to compensatory damages for emotional distress had he asserted a claim for intentional infliction of emotional distress. *Hodge v. Craig*, 2010 WL 4024990, at *12 n.12.

Mr. Craig filed a Tenn. R. App. P. 11 application for permission to appeal that raised two issues – whether misrepresenting the paternity of a child is actionable as fraud, intentional misrepresentation, or negligent misrepresentation and whether the award of damages based on child support, medical expenses, and insurance premiums was an improper retroactive modification of child support. We granted Mr. Craig's application for permission to appeal to address these two issues.

**II.**

The scope of our review[2] in this case depends, in large part, on the issues that the parties have presented to this Court. Subject to the exceptions in Tenn. R. App. P. 13(b), issues are properly raised on appeal to this Court when they have been raised and preserved at trial and, when appropriate, in the intermediate appellate courts[3] and when they have been presented in the manner prescribed by Tenn. R. App. P. 27.

**A.**

The outcome of a case is influenced, at least in part, by how the court approaches the issues presented. *See* Bryan A. Garner, *The Deep Issue: A New Approach to Framing Legal Questions*, 5 Scribes J. Legal Writing 1, 9 (1994-1995); Martineau, *supra* note 2, at 821. Almost seventy years ago, Justice Felix Frankfurter observed that "[i]n law . . . the right answer usually depends on putting the right question." *Rogers' Estate v. Helvering*, 320 U.S. 410, 413 (1943). Thus, a properly framed issue may be the most important part of an appellate brief. Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 83 (2008); David E. Sorkin, *Make Issue Statements Work for You*, 83 Ill. B.J. 39, 39 (Jan. 1995).

Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer. Bryan A. Garner, *Garner on*

---

[2]"Scope of review" defines the issues that may be reviewed by an appellate court when an order or judgment has been properly appealed. *See Holt v. Legislative Reapportionment Comm'n*, 38 A.3d 711, 738 (Pa. 2012); Kelly Kunsch, *Standard of Review (State and Federal): A Primer*, 18 Seattle U. L. Rev. 11, 13 (1994). It "refers to the matters (or 'what') the appellate court is permitted to examine." *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1160 n.11 (Pa. 2010). In contrast, the related, yet distinct, concept of "standard of review" reflects the relationship and the allocation of power between reviewing courts and lower tribunals. It defines how a reviewing court "must look at" the lower tribunal's decision. Jeffrey P. Bauman, *Standards of Review and Scopes of Review in Pennsylvania – Primer and Proposal*, 39 Duq. L. Rev. 513, 515 (2001). The standard of review "defines the level of examination the court may apply, including the degree of deference it will accord to the [lower] court's findings of fact and conclusions of law." 19 James Wm. Moore et al., *Moore's Federal Practice* ¶ 206.1 (3d ed. 2009); *see also Booth v. State*, 251 P.3d 369, 372 (Alaska Ct. App. 2011); *Fields v. Saunders*, 2012 OK 17, ¶ 6 n.5, 278 P.3d 577, 580 n.5; *Turner v. Jackson*, 417 S.E.2d 881, 887 n.5 (Va. Ct. App. 1992); *Peplinski v. Fobe's Roofing, Inc.*, 531 N.W.2d 597, 599 n.1 (Wis. 1995); Robert J. Martineau, *Appellate Practice and Procedure* 779 (2d ed. 1987) ("Martineau").

[3]Issues not raised in the trial court or in the intermediate appellate courts may be deemed waived when presented to this Court. *Brown v. Roland*, 357 S.W.3d 614, 620 (Tenn. 2012); *see also In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001); *Alexander v. Armentrout*, 24 S.W.3d 267, 273 (Tenn. 2000).

*Language and Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed. 1989). Accordingly, "[a]n effectively crafted issue statement will define the question to be considered and begin disposing the court to decide in the client's favor." Judith D. Fischer, *Got Issues? An Empirical Study About Framing Them*, 6 J. Ass'n Legal Writing Directors 1, 25 (2009); *see also State v. Williams*, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995) (stating that "[e]ach issue should . . . relate the conclusion that the party wants the appellate court to reach"); Karl N. Llewellyn, *A Lecture on Appellate Advocacy*, 29 U. Chi. L. Rev. 627, 630 (1962) (stating that "the first thing that comes up is the issue and the first art is the framing of the issue so that if your framing is accepted the case comes out your way").

Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt. Appellants and parties seeking relief under Tenn. R. App. P. 11 must include in their application for permission to appeal[4] and in their brief[5] a statement of the issues they desire to present to the court and an argument with respect to each of the issues presented.[6] The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver. *Fahey v. Eldridge*, 46 S.W.3d 138, 143-44 (Tenn. 2001); *State v. Williams*, 914 S.W.3d at 948.

Appellees who have not filed a notice of appeal and parties who have not filed a Tenn. R. App. P. 11 application of their own have three options with regard to framing the issues on appeal. First, they may simply accept the issues as framed by the appellant.[7] Second, they may reframe the issues presented by the appellant if they find the appellant's formulation of the issues unsatisfactory.[8] Third, they may present additional issues of their own seeking

---

[4]Tenn. R. App. P. 11(b) requires that an application for permission to appeal contain a statement of "the questions presented for review and, for each question presented, a concise statement of the applicable standard of review . . . ."

[5]Tenn. R. App. P. 27(a)(4); *see also Bunch v. Bunch*, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008).

[6]Tenn. R. App. P. 27(a)(7)(A).

[7]Tenn. R. App. P. 27(b).

[8]Tenn. R. App. P. 27(b).

relief on grounds different than the grounds relied on by the appellant or the party filing the Tenn. R. App. P. 11 application.[9]

Parties who have not filed their own application for permission to appeal may present issues other than those presented by the appellant or party seeking Tenn. R. App. P. 11 relief.[10]  To do so, however, Tenn. R. App. P. 27(b) requires a party to include in its brief "the issues and arguments involved in [its] request for relief as well as the answer to the brief of the appellant [or party seeking Tenn. R. App. P. 11 relief]."  *See also Eller Bros., Inc. v. Home Fed. Sav. & Loan Ass'n of Nashville*, 623 S.W.2d 624, 625 (Tenn. Ct. App. 1981), *overruled on other grounds by Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999).  An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7).  *See Baugh v. Novak*, 340 S.W.3d 372, 381 (Tenn. 2011); *Sneed v. Board of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010).  By the same token, an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)*.  See ABN AMRO Mortg. Grp., Inc. v. Southern Sec. Fed. Credit Union*, 372 S.W.3d 121, 132, (Tenn. Ct. App. 2011); *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002).

**B.**

Mr. Craig has properly raised and presented two issues in this case.  The first issue is whether Ms. Hodge's representations regarding the identity of her son's biological father may support a claim for common-law fraud, intentional misrepresentation, or negligent misrepresentation.  In the context of this issue, Mr. Craig asserts that we should follow the lead of other state courts that have recognized a claim for "paternity fraud."  The second issue is whether the trial court's damage award derived from Mr. Craig's post-divorce payments of child support, medical expenses, and medical insurance premiums is an impermissible retroactive modification of a child support order.

---

[9]Tenn. R. App. P. 27(b).

[10]The Advisory Commission on the Rules of Practice and Procedure has pointed out that Tenn. R. App. P. 13(a) "permits the appellee to raise issues allegedly decided erroneously by the intermediate appellate court." Tenn. R. App. P. 11, 1999 advisory comm'n cmt.  The Commission has also pointed out that Tenn. R. App. P. 13(a) "rejects use of the notice of appeal as a review-limiting device" and, therefore, that "[a] separate application for permission to appeal is not necessary to bring up a question of law . . . upon Supreme Court review of the final decision of an intermediate appellate court."  Tenn. R. App. P. 13(a), advisory comm'n cmt.

The statement of the issues in Ms. Hodge's brief required by Tenn. R. App. P. 27(b) contains only two issues. The first issue, one also raised by Mr. Craig, is whether an award of damages based on post-divorce payments of child support, medical expenses, and medical insurance premiums is a retroactive modification of a child support order. The second issue is whether damages for emotional distress and attorney's fees may be awarded incident to a claim that a child's mother negligently, intentionally, or fraudulently misrepresented the parentage of a child to her former spouse.

These two issues, however, are not the only issues contained in Ms. Hodge's brief. In the argument section of her brief, which, with the exception of several non-substantive revisions, appears to be little more than a repetition of the arguments in the brief and supplemental brief she filed with the Court of Appeals, Ms. Hodge raises at least three more issues. First, she insists that Mr. Craig cannot recover for fraud because he did not include a claim for fraud in his "counter petition." Second, she urges this Court "not to establish new law" permitting the recovery of damages for misrepresentations regarding paternity because doing so would not be in a child's best interests. Third, she asserts that the "totality of the evidence" does not support a claim of misrepresentation.

Based on the statements of the issues contained in the briefs filed by Mr. Craig and Ms. Hodge, the parties have properly presented two issues to this Court in the manner envisioned by Tenn. R. App. P. 27. The first issue, presented solely by Mr. Craig, is whether Ms. Hodge's representations regarding the paternity of her son can support a claim of common-law fraud, intentional misrepresentation, or negligent misrepresentation. The second issue, raised by both Mr. Craig and Ms. Hodge, is whether a damage award derived from Mr. Craig's post-divorce payments of child support, medical expenses, and medical insurance premiums is an impermissible retroactive modification of a child support order.

The issues regarding whether Mr. Craig is entitled to recover $100,000 in damages for emotional distress and whether Mr. Craig is entitled to attorney's fees are not before us for two reasons. First, Mr. Craig did not take issue, either in his application for permission to appeal or in his brief, with the decision of the Court of Appeals to vacate the awards for emotional distress or attorney's fees. Second, while Ms. Hodge may present issues that were not presented by Mr. Craig, Tenn. R. App. P. 27(b) limits those issues to ones in which she is seeking "relief from the judgment" of the Court of Appeals. The Court of Appeals ruled in Ms. Hodge's favor with regard to Mr. Craig's claim for damages for emotional distress and to the award of attorney's fees. Therefore, Ms. Hodge could not have been seeking relief from these portions of the judgment of the Court of Appeals. The issue regarding the proper measure of damages in cases such as this one is likewise not before the Court because neither party properly raised and presented this question.

-10-

Ms. Hodge would have been well-served had the statement of the issues in the brief she filed in this Court contained explicit issues matching the points made in the argument section of her brief. However, despite the shortcomings regarding her presentation of the issues, the argument section of the brief Ms. Hodge filed with this Court repeatedly asserts that "the facts in this case do not support a finding of fraud or misrepresentation" on her part. In light of the circumstances of this case, we will exercise our discretion to consider, in addition to the issues that have been properly presented, whether the record supports the trial court's and the Court of Appeals' determination that Mr. Craig proved all the elements of a common-law intentional misrepresentation claim by a preponderance of the evidence.

## III.

The threshold question in this case is whether, as a matter of public policy, Tennessee's courts should be permitted to entertain an action filed by the former spouse of a child's mother seeking to recover damages caused by the mother's misrepresentations regarding the identity of her child's biological father. Mr. Craig asserts that these lawsuits should be permitted either as actions for common-law intentional misrepresentation or negligent misrepresentation or as a newly designated action for paternity fraud. Ms. Hodge responds that this Court should "not establish new law" by permitting these actions because they are contrary to public policy and inconsistent with a child's best interests.

## A.

Tennessee's public policy is reflected in its constitution, statutes, judicial decisions, and common-law rules. *State ex rel. Swann v. Pack*, 527 S.W.2d 99, 112 n.17 (Tenn. 1975) (quoting *Home Beneficial Ass'n v. White*, 180 Tenn. 585, 588, 177 S.W.2d 545, 546 (1944)). The determination of this state's public policy is primarily the prerogative of the General Assembly. *Alcazar v. Hayes*, 982 S.W.2d 845, 851 (Tenn. 1998); *Cavender v. Hewitt*, 145 Tenn. 471, 475-76, 239 S.W. 767, 768 (1922). While this Court's role in declaring public policy is limited, *Taylor v. Beard*, 104 S.W.3d 507, 511 (Tenn. 2003), it is less so when Tennessee's public policy is reflected in the state's common law.

Tennessee is a common-law state. *Powell v. Hartford Accident & Indem. Co.*, 217 Tenn. 503, 509, 398 S.W.2d 727, 730 (1966); *Rush v. Great Am. Ins. Co.*, 213 Tenn. 506, 515, 376 S.W.2d 454, 458 (1964). The sources of the common law can be found in the "usages, habits, manners, and customs of the people." *Jacob v. State*, 22 Tenn. (3 Hum.) 493, 514 (1842). While the "law must be stable . . . it cannot stand still." Roscoe Pound, *Interpretations of Legal History* 1 (1923). Accordingly, the common law is evolutionary. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 502 (1984); *Dunn v. Palermo*, 522 S.W.2d 679, 688 (Tenn. 1975) (quoting *Tesone v. School Dist. No. Re-2*, 384 P.2d 82,

86 (Colo. 1963) (Frantz, C.J., dissenting)). It is flexible enough to adapt to the emerging conditions of society. *Cardwell v. Bechtol*, 724 S.W.2d 739, 744 (Tenn. 1987); *Box v. Lanier*, 112 Tenn. 393, 407, 79 S.W. 1042, 1045 (1904).

The courts should not and must not close their doors to changing conditions. *Metropolitan Gov't of Nashville & Davidson Cnty. v. Poe*, 215 Tenn. 53, 80, 383 S.W.2d 265, 277 (1964). Accordingly, it is now beyond reasoned argument that this Court has the power to develop and adapt common law principles and their application. *Cardwell v. Bechtol*, 724 S.W.2d at 744. Unless the General Assembly has acted to occupy an area formerly governed by the common law, nothing prevents this Court from modifying existing common-law rules, as long as these modifications reflect the changed environment. *Cardwell v. Bechtol*, 724 S.W.2d at 744 (quoting *Powell v. Hartford Accident & Indem. Co.*, 217 Tenn. at 513, 398 S.W.2d at 732).

Common-law principles and rules govern unless they have been changed by statute. *Metropolitan Gov't of Nashville & Davidson Cnty. v. Allen*, 220 Tenn. 222, 230, 415 S.W.2d 632, 635 (1967). It is likewise beyond reasoned argument that the General Assembly, subject only to constitutional limitations, has plenary power to alter the common law. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 536 (Tenn. 2002); *Lavin v. Jordon*, 16 S.W.3d 362, 368 (Tenn. 2000); *Southern Ry. Co. v. Sanders*, 193 Tenn. 409, 415, 246 S.W.2d 65, 67 (1952). Therefore, when the General Assembly has acted to occupy an area of the law formerly governed by the common law, the statute must prevail over the common law in the case of conflict. *Knoxville Outfitting Co. v. Knoxville Fireproof Storage Co.*, 160 Tenn. 203, 206, 22 S.W.2d 354, 355 (1929). In areas of the law where the General Assembly has enacted statutes that clearly and definitively set boundaries on rights, obligations, or procedures, we have recognized that "it should be left to the legislature to change those boundaries, if any are to be changed, and to define new ones." *Taylor v. Beard*, 104 S.W.3d 507, 511 (Tenn. 2003) (quoting *Norwest v. Presbyterian Intercommunity Hosp.*, 631 P.2d 1377, 1380 (Or. Ct. App. 1981)).

In addition to being constitutionally based,[11] our deference to the General Assembly's prerogative to establish Tennessee's public policy rests on fundamental differences between the judicial and legislative process. The courts develop common-law principles on a case-by-case basis over time by deciding specific cases or controversies brought to them by particular parties. *Watson v. Cleveland Chair Co.*, 789 S.W.2d 538, 541 (Tenn. 1989). The courts'

---

[11]Tenn. Const. Art. II, § 3 vests the legislative authority in the General Assembly. In addition, Tenn. Const. Art. II, § 2 provides that "[n]o person or persons belonging to one of these departments [the Legislative, Executive, and Judicial departments created in Tenn. Const. Art. II, § 1] shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."

decisions are based on the unique facts of each case and the application of the appropriate legal principles to those facts. Unlike legislative proceedings, judicial proceedings do not provide an open forum for the discussion and resolution of broad public policy issues. *See Smith v. Gore*, 728 S.W.2d 738, 747 (Tenn. 1987).

**B.**

We candidly recognize that this case implicates the interests of the family, the putative biological father, the mother, the child, the actual biological father, and the State. Cases based on a mother's misrepresentations regarding the identity of a child's biological father present difficult and intractible problems[12] that are "much more complicated than a bad girl, good guy scenario."[13] Those who oppose recognizing these claims insist that the courts' primary concerns should focus on the child and the family[14] and that the putative father's interests should be secondary to those of "the state, the family, and the child in maintaining the continuity, financial support, and psychological security of an established parent-child relationship." *Godin v. Godin*, 725 A.2d 904, 910 (Vt. 1998); *see also State Office of Child Support Enforcement v. Williams*, 995 S.W.2d 338, 340 (Ark. 1999). Those who support these claims assert that there is "a fundamental sense that it is unfair to require a man to support a child with whom he has no biological connection."[15] They also insist that there is a growing recognition that the courts should not force a man to support a child who is not his biological child unless he has been given an opportunity to make a voluntary choice to provide support despite his knowledge that he has no biological relationship with the child.[16]

The legislative process provides the most appropriate forum within which to balance these competing interests. In fact, legislatures in other states have already enacted legislation

---

[12]Ronald K. Henry, *The Innocent Third Party: Victims of Paternity Fraud*, 40 Fam. L.Q. 51, 52 (2006) ("Henry").

[13]Melanie B. Jacobs, *When Daddy Doesn't Want to Be Daddy Anymore: An Argument Against Paternity Fraud Claims*, 16 Yale J.L. & Feminism 193, 196 (2004) ("Melanie B. Jacobs").

[14]Stephen A. Sherman, *You Ain't My Baby Daddy: The Problem of Paternity Fraud and Paternity Laws*, 5 Ave Maria L. Rev. 273, 296 (2007) ("Sherman").

[15]Paula Roberts, *Biology and Beyond: The Case for Passage of the New Uniform Parentage Act*, 35 Fam. L.Q. 41, 54 (2001).

[16]Henry, *supra* note 12, 40 Fam. L.Q. at 51-52, 67-68.

intended to balance the interests at issue in cases of this sort.[17]  However, when the legislature has not acted, the courts must address and resolve legal disputes arising out of these circumstances using the available tools provided by the common law.

There can be little debate that the family plays a vital role in our society.  *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992); *Perrin v. Perrin*, 201 Tenn. 354, 366, 299 S.W.2d 19, 24 (1957); Tenn. Code Ann. § 36-3-113(a) (2010).  Beginning with the enactment of the Married Women's Emancipation Act in 1913, which removed the disabilities of coverture,[18] both the General Assembly and this Court have implemented evolutionary changes in the law's application to these relationships that mirror the changes in society's views of marriage and parentage.

In 1949, the General Assembly placed significant restrictions on filing lawsuits for breach of a contract to marry.[19]  Forty years later, in 1989, the General Assembly repealed the common-law tort claim for alienation of affections.[20]  The following year, the General Assembly abolished the common-law claim for seduction or criminal conversation.[21]  During this same period, this Court totally abolished the common-law doctrine of inter-spousal immunity after determining that "[t]he legal abstraction of unity" of married spouses had

---

[17]For example, Arizona and New Hampshire permit a putative father to seek reimbursement from the child's biological father.  Ariz. Rev. Stat. Ann. § 25-503(F) (2007); N.H. Rev. Stat. Ann. § 168-A:2, III (LexisNexis 2010) (liabilities of the father may be enforced by "other persons").  Idaho permits a putative father to seek reimbursement from either the biological mother or the biological father.  Idaho Code Ann. § 32-1009 (2006).  On the other hand, Arkansas, Delaware, Florida, and Mississippi have enacted statutes specifically prohibiting actions to recover previously paid child support.  Ark. Code Ann. § 9-10-115(f)(1)(D) (2009); Del. Code Ann. tit. 13, § 8-638 (2009); Fla. Stat. Ann. § 742.18(5) (West 2010); Miss. Code Ann. § 93-9-10(5) (Supp. 2011).  *See generally* Kristen K. Jacobs, *If the Genes Don't Fit:  An Overview of Paternity Disestablishment Statutes*, 24 J. Am. Acad. Matrim. Law. 249, 258-66 (2011); Melanie B. Jacobs, *supra* note 13, 16 Yale J.L. & Feminism at 227-33; Sherman, *supra* note 14, 5 Ave Maria L. Rev. at 283-85.

[18]Act of Feb. 20, 1913, ch. 26, 1913 Tenn. Pub. Acts 59 (codified at Tenn. Code Ann. § 36-3-504 (2010)).

[19]Act of Apr. 8, 1949, ch. 161, 1949 Tenn. Pub. Acts 486 (codified at Tenn. Code Ann. §§ 36-3-401 to -405 (2010)).

[20]Act of May 25, 1989, ch. 517, 1989 Tenn. Pub. Acts 902 (codified at Tenn. Code Ann. § 36-3-701 (2010)).  Two years later, this Court abolished the tort retrospectively prior to the effective date of the 1989 legislation.  *Dupuis v. Hand*, 814 S.W.2d 340, 345-46 (Tenn. 1991).

[21]Act of Apr. 12, 1990, ch. 1056, 1990 Tenn. Pub. Acts 773 (codified at Tenn. Code Ann. § 39-13-508 (2010)).  One year later, this Court abolished this tort claim retrospectively prior to the effective date of the 1990 legislation.  *Hanover v. Ruch*, 809 S.W.2d 893, 898 (Tenn. 1991).

become "an historical oddity rather than a functioning concept of law." *Davis v. Davis*, 657 S.W.2d 753, 759 (Tenn. 1983). In addition, both the General Assembly and this Court placed the legal onus on biological parents – both married and unmarried – to provide financial support to their children.[22]

In 1997, the General Assembly replaced the legitimation and paternity statutes which had severely restricted a biological father's ability to obtain a judicial declaration to his parentage.[23] The stated purpose of this Act was to create "a single cause of action to establish parentage of children" other than adoption proceedings or voluntary acknowledgment of parentage. Tenn. Code Ann. § 36-2-301. The Act also abolished "the [essentially conclusive][24] presumption that a child born to a married woman was the offspring of the woman's husband," *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 176-77 (Tenn. Ct. App. 2000), and provided in Tenn. Code Ann. § 36-2-305(b)(1)(C) that any man claiming to be a child's father had standing to seek a judicial determination of his parentage. In 1999, after this Court narrowly construed the application of the 1997 Act, the General Assembly enacted Tenn. Code Ann. § 36-2-304(b)(2)(B) to express its "clear and unequivocal" intent that the new parentage statutes applied retroactively to parentage claims by biological fathers that had been dismissed prior to May 24, 1999, either for lack of standing or because of the now-repealed presumption arising from marital status of the child's mother.[25] *State ex rel. Cihlar v. Crawford*, 39 S.W.3d at 178.

Two provisions in the 1997 Act and in a 1998 amendment to the Act reflect the General Assembly's awareness of the existence of actions to rebut or disestablish paternity and the possibility that a person found not to be a child's biological father could pursue a claim for damages against the child's biological parents. Tenn. Code Ann. § 36-2-304(b)(3), enacted in 1998,[26] states that "[t]he standard of proof in an action to rebut paternity shall be by preponderance of the evidence." Similarly, Tenn. Code Ann. § 36-2-309(b) states, in part, that "[n]othing in this subsection (b) shall preclude the issuance of a judgment against the

---

[22]Tenn. Code Ann. § 34-1-102(a), (b) (2007); *Smith v. Gore*, 728 S.W.2d at 750-51; *see also State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 247 (Tenn. Ct. App. 2000).

[23]Act of May 29, 1997, ch. 477, 1997 Tenn. Pub. Acts 862 (codified as amended at Tenn. Code Ann. §§ 36-2-301 to -322 (2010)).

[24]The presumption could be rebutted with evidence that the husband was infertile or that the husband did not have access to his wife when the child was conceived. *See Jackson v. Thornton*, 133 Tenn. 36, 38, 179 S.W. 384, 384 (1915); *Shell v. Law*, 935 S.W.2d 402, 406 (Tenn. Ct. App. 1996).

[25]*See* Act of May 24, 1999, ch. 339, 1999 Tenn. Pub. Acts 756.

[26]Act of Apr. 29, 1998, ch. 1098, § 8, 1998 Tenn. Pub. Acts 1113, 1116.

mother or actual biological father of the child or children in favor of the person subsequently found not to be the father of the child or children."

The General Assembly has not directly addressed the issues or interests implicated in this case. We have carefully reviewed the Constitution of Tennessee and our decisions construing it, as well as the existing statutes pertaining to families and domestic relations, and find no distinct reflection that Tennessee's public policy either favors or opposes claims or remedies of the sort pursued by Mr. Craig in this case.

Our limited role in declaring public policy is particularly relevant when we are being asked to recognize new causes of action that do not presently exist. *Taylor v. Beard*, 104 S.W.3d at 511. However, we are acting within our authority when we inquire whether public policy prevents the continuing development of the common law. *See Smith v. Gore*, 728 S.W.2d at 747.

Misrepresentations to a prospective spouse that he is an unborn child's biological father "[go] to the essence of the marital relationship." *Miller v. Miller*, 1998 OK 24, ¶ 44, 956 P.2d 887, 904 (recognizing a claim for fraudulent inducement to marry). Accordingly, and in light of the historically broad reach of common-law actions for intentional misrepresentation, we have determined that the public policy of this state, reflected in the Constitution of Tennessee and the statutes enacted by the General Assembly, does not prevent the former spouse of a child's mother from pursuing common-law damage claims against the child's mother based on her intentional misrepresentations regarding the identity of the child's biological father.

While our decision in this case rests entirely on Tennessee law, we note that the courts in five other states have recognized that a putative father may maintain an action for damages for intentional misrepresentation or fraud against a child's biological mother based on her misrepresentations regarding the identity of the child's biological father. *Koelle v. Zwiren*, 672 N.E.2d 868, 875 (Ill. App. Ct. 1996); *Denzik v. Denzik*, 197 S.W.3d 108, 112-13 (Ky. 2006); *G.A.W., III v. D.M.W.*, 596 N.W.2d 284, 290 (Minn. Ct. App. 1999); *Miller v. Miller*, 1998 OK 24, ¶¶ 46-49, 956 P.2d at 904-05 (recognizing a claim for restitution of child support based on extrinsic fraud); *Masters v. Worsley*, 777 P.2d 499, 502 (Utah Ct. App. 1989); *see also* John G. Hall, Note, *Child Support Supported: Policy Trumps Equity in* Martin v. Pierce *Despite Fraud and a Controversial Amendment to the Paternity Code*, 61 Ark. L. Rev. 571, 588 (2008).[27] One other court has recognized a claim by the putative father

_____

[27]Other courts have not permitted a putative father to recover from the biological mother for intentional misrepresentation based on the effects of the proceeding on the child and their conclusion that
(continued...)

-16-

against the child's biological father. *R.A.C. v. P.J.S., Jr.*, 927 A.2d 97, 104 (N.J. 2007) (recognizing the claim but holding that this particular claim was barred by New Jersey's 23-year statute of repose). Other courts have concluded that similar misrepresentations by a child's biological mother regarding the identity of a child's biological father constitute fraud and provide a basis for setting aside an earlier adjudication of paternity. *See, e.g.*, *Williams v. Williams*, 2001-CA-01666-SCT (¶ 17), 843 So. 2d 720, 723 (Miss. 2003); *Glover v. Severino*, 2008 PA Super 51, ¶ 26, 946 A.2d 710, 712-14; *N.C. v. M.H.*, 2007 PA Super 123, ¶ 12, 923 A.2d 499, 503; *Batrouny v. Batrouny*, 412 S.E.2d 721, 723-24 (Va. Ct. App. 1991).

## IV.

Having determined that public policy does not prevent the former spouse of a child's mother from pursuing a common-law damage claim based on her misrepresentations regarding the identity of the child's biological father, we must now determine whether common-law actions for intentional misrepresentation or negligent misrepresentation may be pursued in Tennessee and whether Mr. Craig has submitted sufficient evidence to prove one or more of these claims.

## A.

The law has never undertaken to precisely define fraud. The courts have long recognized that "fraud assumes many shapes, disguises and subterfuges," *Waller v. Hodges*, 45 Tenn. App. 117, 130, 321 S.W.2d 265, 271 (1958) (quoting 1 Henry R. Gibson, *Gibson's Suits in Chancery* § 456, at 520 (5th ed. 1955)), and that any effort to define fraudulent conduct would be futile. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193 n.41 (1963) ("Fraud is infinite, and were a Court of Equity once to lay down rules, how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes which the fertility of man's invention would contrive").

The ancient common-law action for deceit provided the vehicle for persons to seek recovery from those who intend to deceive others for their own benefit. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 105, at 727-28 (5th ed. 1984) ("Prosser &

---

[27](...continued)
the putative father had not been harmed. *See, e.g.*, *Steve H. v. Wendy S.*, 67 Cal. Rptr. 2d 90, 93-94 (Ct. App. 1997) ; *Nagy v. Nagy*, 258 Cal. Rptr. 787, 791 (Ct. App. 1989); *Parker v. Parker*, 950 So. 2d 388, 394-95 (Fla. 2007); *Grand v. Hope*, 617 S.E.2d 593, 597-98 (Ga. Ct. App. 2005); *Day v. Heller*, 653 N.W.2d 475, 479-82 (Neb. 2002); *Pickering v. Pickering*, 434 N.W.2d 758, 761-62 (S.D. 1989).

Keeton"). The basis for finding legal responsibility for deceit centered on the defendant's intent to deceive, mislead, or convey a false impression. Prosser & Keeton, § 107, at 741.

Throughout the centuries, the courts have had little difficulty finding the required intent to deceive when the evidence shows either that the defendant knows the statement is false or that the defendant made the statement "without any belief as to its truth, or with reckless disregard whether it be true or false." Prosser & Keeton, § 107, at 741-42. When a victim of deceit sought restitution, the courts customarily considered the inequity of allowing the defendant to retain what he or she obtained from the plaintiff. However, in cases in which the deceit involved the transfer of something of value, the courts permitted the plaintiff to recover direct damages, along with special and consequential damages. Prosser & Keeton, § 110, at 765-66.

Our current common-law claim for intentional misrepresentation is the successor to the common-law action for deceit. *First Nat'l Bank of Louisville v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). In fact, "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999).[28] In this opinion, we will refer to the cause of action as a claim for intentional misrepresentation, and, in order to avoid confusion, we suggest that this term should be used exclusively henceforth. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012) (noting that "intentional infliction of emotional distress" and "outrageous conduct" were different names for the same tort and stating that the tort should be referred to as "intentional infliction of emotional distress").

To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d at 311 (quoting *Metropolitan Gov't of Nashville & Davidson Cnty. v. McKinney*, 852

---

[28]This Court has recognized that "intentional misrepresentation" and "fraudulent misrepresentation" have the same elements. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). These elements overlap the elements of a common-law fraud claim. *See Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66-67 (Tenn. 2001); *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976).

S.W.2d 233, 237 (Tenn. Ct. App. 1992)); *see also* 8 Tennessee Practice: Tennessee Pattern Jury Instructions – Civil § 8.36, at 357 (11th ed. 2011).

Adopting the Restatement (Second) of Torts § 549 (1977), this Court has held that the proper measure of damages for an intentional misrepresentation claim is:

> (1) The recipient of [an intentional] misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in [the][29] transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

> (2) The recipient of [an intentional] misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

*Boling v. Tennessee State Bank*, 890 S.W.2d 32, 35-36 (Tenn. 1994) (quoting Restatement (Second) of Torts § 549 (1977)).

The record in this case supports the conclusion of both the trial court and the Court of Appeals that Mr. Craig presented sufficient evidence to prove each of the elements of his intentional misrepresentation claim against Ms. Hodge. When Ms. Hodge discovered she was pregnant, she represented to Mr. Craig that he was the child's biological father and that no one else could be. This representation was false when it was made, and Ms. Hodge made this representation recklessly without knowing whether it was true or false. She knew that she had had sexual relations with Mr. Hay. Mr. Craig had no reason to know that Ms. Hodge's representation that he was the child's biological father was false, and he was justified in relying on the truth of Ms. Hodge's representation. Mr. Craig was damaged as a result of his belief that Ms. Hodge had told him the truth when she told him that he was the biological father of her child. Putting aside his decision to marry Ms. Hodge, Mr. Craig sustained monetary damages, not the least of which was his court-ordered obligation to pay

---

[29]In its quotation of the Restatement, the Court inadvertently substituted "a" for "the" in Restatement (Second) of Torts § 549(1). This non-substantive alteration of the Restatement's text was not intended to alter the application or effect of the principles in Restatement (Second) of Torts § 549 in Tennessee.

child support and his payments for the child's medical expenses and insurance premiums following his divorce from Ms. Hodge.[30]

The laudable goals of preserving intact families, promoting healthy relationships between parents and their children, and shielding children from their parents' vitriolic disagreements will not be advanced in this case by preventing Mr. Craig from pursuing his intentional misrepresentation claim against Ms. Hodge. The family unit here was already dissolved when Mr. Craig and Ms. Hodge divorced in 2001. The once healthy relationship between Mr. Craig and Kyle was extinguished in 2007. Providing stable financial support for Kyle is no longer a concern because the trial court relieved Mr. Craig of his obligation to support Kyle in 2005 and because Kyle turned eighteen in June 2010.[31]

**B.**

Tennessee's courts have also recognized the common-law tort of negligent misrepresentation and have adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims. *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991); *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 433 (Tenn. 1991). Liability for negligent misrepresentation under the Restatement (Second) of Torts § 552 is more restricted than liability for intentional misrepresentation. Restatement (Second) of Torts § 552 cmt. a, at 127.

One of the most significant restrictions on liability for negligent misrepresentation is that it is limited to persons "who, in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest, [supply] false information for the guidance of others in their business transactions." Restatement (Second)

---

[30]Because of the procedural posture of this case, we are not required to address the proper measure of damages in cases of this sort. Mr. Craig has not taken issue with the portion of the opinion of the Court of Appeals vacating his $100,000 damage award for intentional infliction of emotional distress, and Ms. Hodge has not argued that reimbursement for Mr. Craig's post-divorce payments for child support, medical expenses, and insurance premiums should not have been included as part of Mr. Craig's damages. The resolution of questions relating to the claims that can be filed, the defenses that can be asserted, and the damages that can be recovered in cases of this sort, beyond those directly raised by the parties, must await another day.

[31]Our decision in this case is limited to the factual circumstances before us – a lawsuit filed by the former spouse of a child's biological mother seeking damages for intentional misrepresentation of the child's parentage. This case does not require us to address other circumstances, including similar disputes between persons who were never married or persons who are separated but not divorced. Determining the appropriateness of actions for intentional misrepresentation of parentage in these and other circumstances can be made only in the appropriate case.

of Torts § 552(1). The official comments make clear that liability under the Restatement (Second) of Torts § 552 is limited to "a supplier of information to be used in commercial transactions." Restatement (Second) of Torts § 552 cmt. a, at 128.

This Court has consistently limited liability for negligent misrepresentations to "business or professional persons who negligently supply false information for the guidance of others in their business transactions." *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d at 433; *see also Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 131 (Tenn. 1995) (noting that the Restatement (Second) of Torts § 552 "obviously includes non-professionals involved in certain business activities or transactions"); *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d at 595 (quoting *Stinson v. Brand*, 738 S.W.2d 186, 190 (Tenn. 1987)). Most recently, we rejected a negligent misrepresentation claim against a lawyer for providing advice informally for guidance in a personal matter that was not a business transaction. *Robinson v. Omer*, 952 S.W.2d 423, 428 (Tenn. 1997). In doing so, we characterized the requirement that the misrepresentation be made to guide others "in their business transactions" as an "essential element" of a negligent misrepresentation claim under the Restatement (Second) of Torts § 552. *Robinson v. Omer*, 952 S.W.2d at 428.

Other state courts have similarly limited negligent misrepresentation claims to statements made in a business or commercial setting. *See, e.g.*, *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 813-14 (Ariz. 1987); *Allen v. Steele*, 252 P.3d 476, 484 (Colo. 2011); *Kentucky Farm Bureau Mut. Ins. Co. v. Blevins*, 268 S.W.3d 368, 373 (Ky. Ct. App. 2008); *Sampson v. MacDougall*, 802 N.E.2d 602, 608 (Mass. App. Ct. 2004); *Swanson v. Ptak*, 682 N.W.2d 225, 232 (Neb. 2004); *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998); *Richland Sch. Dist. v. Mabton Sch. Dist.*, 45 P.3d 580, 585-86 (Wash. Ct. App. 2002). In addition, courts in at least two states have explicitly disapproved of negligent misrepresentation claims under the Restatement (Second) of Torts § 552 filed by putative fathers against the child's biological mother based on misrepresentations involving the identity of the child's biological father. *G.A.W., III v. D.M.W.*, 596 N.W.2d at 290; *Pickering v. Pickering*, 434 N.W.2d at 762. However, the courts in two states have permitted adoptive parents to assert negligent misrepresentation claims against adoption agencies for failing to supply them with information in the agency's possession regarding the biological parents' genetic information and medical background. *Roe v. Catholic Charities of the Diocese of Springfield*, 588 N.E.2d 354, 361 (Ill. App. Ct. 1992); *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 287-88 (Minn. 1992).

For over two decades, we have limited the application of negligent misrepresentation claims under the Restatement (Second) of Torts § 552 to representations made in connection with a business or commercial transaction. Even though modern marriage has been

characterized by some as inherently contractual,[32] communications between a couple regarding the parentage of a child do not involve a commercial or business transaction.

We recognize that "[t]he inexhaustible and ever-changing complications in human affairs are constantly presenting new questions and new conditions which the law must provide for," *Box v. Lanier*, 112 Tenn. at 408, 79 S.W. at 1045 (quoting *Woodman v. Pitman*, 10 A. 321, 322 (Me. 1887)), and that, as a common-law court, we are obligated to revise, or even abolish, court-made rules in light of these changed conditions. *Broadwell ex rel. Broadwell v. Holmes*, 871 S.W.2d 471, 473 (Tenn. 1994); *Dupuis v. Hand*, 814 S.W.2d at 345-46. However, Mr. Craig has not provided us with, nor has our independent research identified, any strongly convincing basis for expanding the scope of negligent misrepresentation claims under the Restatement (Second) of Torts § 552 to apply to private communications between a woman and a man regarding the paternity of a child. Accordingly, like the courts in Minnesota and South Dakota, we decline to hold that a mother's former husband may bring a negligent misrepresentation action against his former spouse based upon her negligent misrepresentations that he is the child's biological father.

## V.

Having determined that Mr. Craig may pursue and has successfully proved his common-law intentional misrepresentation claim against Ms. Hodge, we must decide whether awarding him damages on the amount of child support, medical expenses, and insurance premiums he paid following the parties' divorce constitutes a retroactive modification of child support of the sort prohibited by Tenn. Code Ann. § 36-5-101(f)(1). The Court of Appeals concluded it did. *Hodge v. Craig*, 2010 WL 4024990, at *9. Based on our reading of the plain language of the statute, as well as its legislative history, we respectfully disagree.

Prior to 1987, Tennessee's courts were permitted to modify child support orders retroactively if they found that a parent was unable to pay the full amount of support "through no intentional fault of his or her own and that the facts of the case require such a modification retroactively in order to meet the ends of justice." Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 1986). The courts had construed this provision to permit them to modify

---

[32]*See Hopson v. St. Mary's Hosp.*, 408 A.2d 260, 261 (Conn. 1979); *Rivera v. Rivera*, 2010-NMCA-106, ¶ 9, 149 N.M. 64, 69, 243 P.3d 1148, 1151; *Rivkin v. Postal*, No. M1999-01947-COA-R3-CV, 2001 WL 1077952, at *3 (Tenn. Ct. App. Sept. 14, 2001) (No Tenn. R. App. P. 11 application filed); Linda L. Berger, *Lies Between Mommy and Daddy: The Case for Recognizing Spousal Emotional Distress Claims Based on Domestic Deceit That Interferes with Parent-Child Relationships*, 33 Loy. L.A. L. Rev. 449, 451 (2000) (noting "the 1960s vision of marriage as the voluntary joinder of independent and equal personalities").

or even forgive child support arrearages. *Gossett v. Gossett*, 34 Tenn. App. 654, 659-60, 241 S.W.2d 934, 937 (1951); *Crane v. Crane*, 26 Tenn. App. 227, 231, 170 S.W.2d 663, 665 (1942).

Although child support had traditionally been within the domain of the States, Congress enacted the Child Support Enforcement Act of 1975[33] based on its concerns regarding decreased support for children following a divorce and the lack of uniform and effective enforcement of child support orders. This program – commonly known as the "IV-D" program – provided incentives to states to improve their own laws and procedures for collecting child support by providing increasing matching funds to states whose child support laws and collection procedures satisfied detailed federal standards. *See Baker v. State ex rel. Baker*, No. 01A01-9509-CV-00428, 1997 WL 749452, at *2 (Tenn. Ct. App. Dec. 5, 1997) (No Tenn. R. App. P. 11 application filed). In order to receive the federal matching funds, the General Assembly modified Tennessee's statutes governing child support to meet the federal requirements.[34]

In the Omnibus Budget Reconciliation Act of 1986,[35] Congress added the following new requirement for states to receive matching funds:

> Procedures which require that any payment or installment of support under any child support order, whether ordered through the State judicial system or through the expedited processes required by paragraph (2), is (on and after the date it is due)–
>
> (A) a judgment by operation of law, with full force, effect, and attributes of a judgment of the State, including the ability to be enforced,
>
> (B) entitled as a judgment to full faith and credit in such State and in any other State, and

---

[33] *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101(a), 88 Stat. 2337, 2351-58 (codified as amended at 42 U.S.C.A. §§ 651- 669b (West 2011)).

[34] *See Baker v. State ex rel. Baker*, 1997 WL 749452, at *3 (describing five bills enacted by the General Assembly between 1977 and 1994 in order to meet the federal requirements).

[35] Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874.

　　　　(C) not subject to retroactive modification by such State or by any other State;

　　　　except that such procedures may permit modification with respect to any period during which there is pending a petition for modification, but only from the date that notice of such petition has been given, either directly or through the appropriate agent, to the obligee or (where the obligee is the petitioner) to the obligor.

42 U.S.C.A. § 666(a)(9) (West 2011).[36]　The House Conference Report explains that Congress was concerned that a number of states – like Tennessee – permitted retroactive modification of child support awards, including the reduction or nullification of arrearages. Congress was also concerned that, under the Uniform Reciprocal Enforcement of Support Act ("URESA"), these states could retroactively modify child support orders entered in other states.　Accordingly, to prevent the reduction or nullification of arrearages, Congress desired to prevent states from making retroactive changes in child support orders.[37]

　　　One year later,[38] the General Assembly responded to Congress's action by enacting Tenn. Code Ann. § 36-5-101(f)(1) which provides, in part:

　　　　Any order for child support shall be a judgment entitled to be enforced as any other judgment of a court of this state, and shall be entitled to full faith and credit in this state and in any other state.　Such judgment shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties.

In this Court's first occasion to construe this statute, we noted that the legislative history of the statute

---

[36] *See* Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9103, 100 Stat. 1874, 1973.

[37] *See* H.R. Rep. No. 99-1012, at 272-73 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 3917-18.

[38] Act of Mar. 12, 1987, ch. 39, 1987 Tenn. Pub. Acts 47.

reflects the General Assembly's clear understanding that as a result of legislative action to bring Tennessee law in line with the federal requirement, the courts of this state would lose their ability to forgive past arrearages in child support cases (but not the discretion to determine how and when the past due amounts were to be paid).

*Rutledge v. Barrett*, 802 S.W.2d at 606.

Mr. Craig's April 3, 2009 damage award is not a retroactive modification of a child support obligation prohibited by Tenn. Code Ann. § 36-5-101(f)(1) for two reasons. First, this record contains no evidence (1) that Mr. Craig had a legally enforceable obligation to pay child support when the judgment was entered,[39] (2) that Mr. Craig owed Ms. Hodge any child support in 2005 when the trial court ordered Ms. Hodge to begin paying child support to him, or even (3) that Mr. Craig had ever been delinquent in paying child support during those times when he was obligated to do so.[40] Therefore, the 2009 damage award did not have the effect of reducing or extinguishing any child support arrearage owed by Mr. Craig.

Second, the April 3, 2009 judgment did not purport to change or modify Mr. Craig's child support obligations as they had existed following the January 2005 order relieving him of his responsibility to pay child support. At the time the 2009 judgment was entered, Mr. Craig had no legally enforceable obligation to pay Ms. Hodge child support for Kyle's benefit. As the victim of Ms. Hodge's intentional misrepresentations regarding Kyle's paternity, Mr. Craig was entitled to recover the pecuniary loss he suffered as a result of his justifiable reliance on Ms. Hodge's representations that he was Kyle's biological father and that no one else could be. Restatement (Second) of Torts § 549. The trial court did not err by ascertaining the amount of this pecuniary loss by considering the amount of child support, medical expenses, and insurance premiums Mr. Craig had paid on Kyle's behalf following the parties' divorce.

---

[39]As a result of the trial court's July 16, 2007 order, Ms. Hodge was awarded sole custody of Kyle, and Mr. Craig's obligation to support him was ended.

[40]Our holding is limited to the circumstances in the record showing, without dispute, that at all times during this proceeding, Mr. Craig did not owe back child support to Ms. Hodge. Nothing in this opinion should be construed as preventing others who owe back child support from filing an intentional misrepresentation claim similar to the one filed by Mr. Craig in this case. If a party owing back child support prevails, the trial court, rather than forgiving the past due child support, will be required to offset the judgment by the amount of the past due child support owed at the time suit was filed.

## VI.

We affirm the determination of the Court of Appeals that Ms. Hodge intentionally misrepresented Kyle's paternity to Mr. Craig. However, we reverse its determinations that Mr. Craig could not pursue a common-law intentional misrepresentation claim against Ms. Hodge based on her representations that he was Kyle's biological father and that no one else could be and that the judgment awarding Mr. Craig damages amounted to a retroactive modification of child support prohibited by Tenn. Code Ann. § 36-5-101(f)(1). However, because of the trial court's error in computing the amount of damages, we remand the case to the trial court with directions to amend its judgment to award Mr. Craig $25,244.44 in damages for the child support, medical expenses, and insurance premiums he paid following the divorce and for whatever other proceedings consistent with this opinion may be required. We tax the costs of this appeal to Tina Marie Hodge for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE