IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2019

## PAIGE DIANE GRIFFITH v. RICHARD JOHN GRIFFITH

**Appeal from the Chancery Court for Lewis County**
**No. 2016-cv-92     Deanna B. Johnson, Judge**

_____

### No. M2018-01245-COA-R3-CV

_____

This appeal arises from a divorce proceeding.  The only issues raised on appeal relate to the trial court's awards of alimony and child support.  For the following reasons, we affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which RICHARD H. DINKINS and JOHN W. MCCLARTY, JJ., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Richard John Griffith.

Jennifer F. Franks, Columbia, Tennessee, for the appellee, Paige Diane Griffith.

### MEMORANDUM OPINION[1]

### I.  FACTS AND PROCEDURAL HISTORY

_____

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value.  When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Richard John Griffith ("Husband") and Paige Diane Griffith ("Wife") married in 1999. Husband and Wife were both working part-time at Frito-Lay when they met, but Husband subsequently got a job at General Motors (at the time, Saturn), and he was employed there when the parties married. Wife maintained employment until 2000, when the parties' first child ("Son") was born; the parties thereafter agreed that Wife would not work outside the home. The parties' daughter ("Daughter") was born in 2002. Husband continued to work at General Motors throughout the marriage and earned a six-figure income most years. Wife took care of the household and home schooled the parties' two children. She explored some business opportunities during the marriage and applied for a few jobs, but nothing came to fruition.

Wife filed a complaint for divorce in September 2016 after learning that Husband had engaged in an extramarital affair. Wife sought to be named primary residential parent and asked the court to award her alimony, child support, and attorney's fees. Husband filed an answer admitting that he was guilty of inappropriate marital conduct and agreeing that Wife should be designated primary residential parent.

Husband eventually moved out of the marital residence to live with a girlfriend; his income continued to be used to pay the marital bills, as well as Husband's separate expenses. In April 2017, Husband accepted a different position at General Motors, and his income decreased significantly. Wife borrowed money and sold assets to pay the parties' debts. The parties' home and 79 acres of land was eventually also listed for sale.

The divorce trial was held on January 24, 2018. By that time, Wife was fifty-four years old, and Husband was forty-two. The parties had been married eighteen years, and Wife had not worked outside the home since she was employed around the time of the marriage. Although Wife had a GED and held a cosmetology license, the most she had earned in a year was around $30,000.00 prior to the parties' marriage. Wife had numerous health issues. The parties agreed that Wife would be designated primary residential parent, and Husband would have eighty days of parenting time to be exercised every other weekend. They also agreed that Wife would continue home schooling the children until they graduated from the home school program.

Son was sixteen years old at the time of trial, and Daughter was fifteen years old. Both were struggling to cope with the divorce. At the time of trial, Son had been living at an out-of-state residential treatment facility for the past six months and was expected to remain there until age eighteen if the parties could afford to pay for the treatment. Because Son and Daughter had been struggling with poor grades while the divorce was pending, and Son had missed home school to attend treatment, Wife told Son and Daughter that they could repeat their current grade level in the home school program.

Husband was earning $34.75 per hour and working forty hours per week at the time of trial in January 2018. In 2016, the year the divorce complaint was filed, Husband

earned $141,306.00 in gross income. His gross income for 2017 was only $101,325.42, as Husband had accepted a change in his position effective on or about April 27, 2017. For the first four months of 2017 leading up to that date, Husband had been earning an average of $1,038.25 per week in overtime, working as a union shop committeeman. At the end of April, Husband accepted a position to serve as health and safety representative for the union. From that point forward, Husband averaged only $74.28 in overtime pay per week for the remainder of 2017. Husband acknowledged that he had "voluntarily decided to change jobs," but he claimed that he did so because his "reelection outlook was not great" for his previous position.

For purposes of calculating alimony and child support, Wife asked the court to average Husband's income for the past six years, which would equate to a monthly gross income of $11,176.21. She suggested that her income should be set at zero. Wife requested alimony in futuro in the sum of $3,500.00 per month, while Husband suggested that Wife should only receive transitional or some other form of short-term alimony.

On June 11, 2018, the trial court entered a 58-page written order containing very detailed findings of fact and conclusions of law, with additional attachments including a permanent parenting plan and various tables setting forth the court's property division. After dividing the marital estate, including a debt representing the costs of Son's treatment that was assigned to Husband, the trial court addressed the disputed issues of child support and alimony. The trial court found Wife voluntarily unemployed but concluded that her earning capacity was limited due to her lack of recent work experience and the need for her to continue home school. The court found that Wife could earn $7.25 per hour for twenty hours per week, for a monthly gross income of $628.00, until the children complete home school, and $1,256.00 per month working full-time thereafter. The trial court also found that Husband was willfully underemployed. It found that Husband voluntarily took a job that substantially decreased his ability to earn the same level of income to which his family had become accustomed and did so at a time when the family finances were under pressure due to the pending divorce. As such, the court averaged Husband's gross income for the past three years and calculated his annual income at $119,270.00 per year, or $9,939.17 per month. Utilizing these figures, the trial court calculated Husband's child support obligation at $1,501.18 per month until Son was expected to graduate from home school, and then $1,128.00 per month until Daughter was expected to graduate. The trial court awarded Wife $3,000.00 per month in alimony in futuro. It also ordered Husband to pay $17,639.30 for Wife's attorney's fees. Husband timely filed a notice of appeal.

## II. ISSUES PRESENTED

Husband presents the following issues, which we have slightly reworded, for review on appeal:

1.    Whether the trial court abused its discretion in setting Husband's alimony and child support obligations based on a finding of voluntary underemployment and setting the awards at a level he is unable to pay.

2.    Whether the trial court erred in awarding Wife alimony in futuro rather than rehabilitative alimony.

3.    Whether the trial court erred in awarding child support for a child who was no longer living in the home and by extending the child support obligation beyond the children's normal graduation date.

For the following reasons, we affirm the decision of the chancery court in part, vacate in part, and remand for further proceedings.[2]

### III.    DISCUSSION

#### A.    *Husband's Voluntary Underemployment*

If a parent is found to be willfully or voluntarily underemployed, "additional income can be allocated to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity," and the increased amount is used to calculate the parent's child support obligation. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II). "This is based on the premise that parents may not avoid their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009).

"Determining whether a party is willfully underemployed is a question of fact over which the trial court has 'considerable discretion.'" *Jackson v. Jackson*, No. M2018-00361-COA-R3-CV, 2018 WL 4896656, at *9 (Tenn. Ct. App. Oct. 9, 2018) (quoting *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001)). Appellate courts accord "substantial deference to the trial court's decision, especially when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses." *Reid v. Reid*,

---

[2] We note that within the conclusion section of Husband's brief, he also requests reversal of the trial court's award of attorney's fees. However, Husband failed to designate this as an issue presented for review on appeal or develop any argument with regard to this issue. "[W]here a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). "By the same token, an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). As such, we deem Husband's argument regarding attorney's fees waived.

We likewise find that Wife waived any issue regarding attorney's fees on appeal by failing to designate it as an issue for review. *See Rigsby v. Rigsby*, No. E2014-02095-COA-R3-CV, 2015 WL 7575075, at *7 (Tenn. Ct. App. Nov. 25, 2015) ("Because Mother did not raise the issue of attorney's fees on appeal in her statement of the issues, we determine this issue to be waived.").

No. M2017-00119-COA-R3-CV, 2018 WL 3912297, at \*5 (Tenn. Ct. App. Aug. 15, 2018).

A determination of willful or voluntary underemployment "is not limited to choices motivated by an intent to avoid or reduce the payment of child support" and "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I). The purpose of our analysis is "to ascertain the reasons for the parent's occupational choices, and to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and to determine whether such choices benefit the children." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii). Some relevant factors that may be considered are the parent's past and present employment; the parent's education, training, and ability to work; whether the parent is a stay-at-home parent; and whether the parent has an extravagant lifestyle. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii). However, "the 'complete factual background of the obligor's situation' is relevant." *Goodrich v. Goodrich*, No. M2017-00792-COA-R3-CV, 2018 WL 1976108, at \*3 (Tenn. Ct. App. Apr. 26, 2018) (quoting *Ralston v. Ralston*, No. 01A01-9804-CV-00222, 1999 WL 562719, at \*5 (Tenn. Ct. App. Aug. 3, 1999)).

We must examine the circumstances under which Husband left his previous position in order to determine whether the move was "voluntary or involuntary." *Kanka v. Kanka*, No. M2016-01807-COA-R3-CV, 2018 WL 565841, at \*5 (Tenn. Ct. App. Jan. 25, 2018). When a parent with a child support obligation "chooses to accept a job which provides significantly less income, courts are more inclined to find willful and voluntary underemployment." *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). We may also consider the parent's course of action after leaving the previous position and whether the parent attempted to replace the lost income. *Id.*

Husband argues on appeal that he "did not voluntarily give up his union position." However, his own trial testimony indicates that he did. To briefly recap, in 2016, when the complaint for divorce was filed, Husband earned $141,306.00. During the previous five years, his income ranged between $115,180.00 and $166,859.00. By all accounts, Husband worked overtime at every opportunity while the parties were married and sometimes worked seven days a week. After the complaint for divorce was filed and Husband moved in with his girlfriend, paying her rent and also sharing other bills, Wife began to experience difficulties paying the family's bills. In March 2017, Wife sent an email message to Husband listing their account balances and stating, "We can not [sic] pay the bills without the overtime." The very next month, however, Husband changed positions at General Motors, and his average *weekly* overtime pay decreased from $1,038.25 to a mere $74.28. Husband's annual income for 2017 decreased to $101,325.42. Husband emphasizes that he did not live an extravagant lifestyle as far as housing, as he lived with his girlfriend in a single-wide trailer. However, he went on a cruise and several other trips with his girlfriend during this time. When Wife repeatedly

asked Husband to work more overtime so that she could pay the credit card bills, Husband either would not respond or would tell her to "let them go" because he was just going to file for bankruptcy anyway.

At trial, Husband attempted to explain why he left his position on the union shop committee, which offered expanded overtime opportunities, where Husband had been employed since 2010. He said that the makeup of the plant had changed over the past five years because his employer hired a lot of Millennials with an "entitlement mentality" who blamed him for everything. He testified that when election time was approaching, he "saw the writing on the wall" and voluntarily took a different position in the health and safety department, believing that his "reelection outlook was not great." He initially testified that his overtime opportunities in the new position would "equalize" with the position he held before he was a union shop committeeman. Husband suggested that the company simply was not offering a lot of overtime opportunities in the latter part of 2017 due to low demand for vehicles. However, he acknowledged that he had earned at least $115,000.00 every year since 2010, despite supply and demand fluctuations, compared with a 2017 income of $101,325.00. When pressed, Husband finally admitted that "there technically is no overtime in my [new] position." Notably, Husband also conceded that he "voluntarily decided to change jobs."

In its written order, the trial court described in detail Husband's earnings history and noted that he worked considerable overtime, sometimes seven days a week, during the marriage. The trial court found that Wife asked Husband to continue working overtime in March 2017 because she could not pay the credit card bills. It found that she contacted Husband on numerous other occasions about problems with the finances and asked him to work overtime. Instead, the trial court found, Husband stopped working overtime in April 2017, substantially reducing his pay and creating financial hardship for the family. The court found that he "voluntarily changed jobs." Because Husband "voluntarily took a job that substantially decreased his ability to earn the same level of income to which his family had become accustomed," and he did so at a time when "the family finances were under pressure due to the pending divorce," the court found that Husband was willfully underemployed within the meaning of the child support guidelines. The evidence clearly supports the trial court's conclusions. Husband's voluntary decision to change to a job that offered little to no overtime without even attempting to maintain his current position was not reasonable in light of his pressing financial situation and his duty to support his children. We affirm the finding of voluntary underemployment.

The trial court determined Husband's earning capacity by averaging his income for the past three years. We discern no error in that decision. The guidelines specifically provide that overtime payments are to be included in determining gross income, and such payments "shall be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine

gross income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(b); *see, e.g.*, **Willis**, 62 S.W.3d at 739 (concluding that a parent was voluntarily underemployed and that his potential income calculation should include an average of his overtime pay).

### B. *Child Residing in the Home*

Next, we deem it appropriate to address Husband's contention that the trial court erred by calculating child support based on *two* children, thereby "awarding child support for a child who was no longer living in the home." Again, at the time of trial in January 2018, Son had been living at an out-of-state residential treatment facility for six months. Son was sixteen years old at the time of trial but turned seventeen shortly thereafter. He was expected to remain at the treatment facility until the age of eighteen if the parties could afford it, but Wife testified that the duration of Son's stay was very uncertain. Husband had agreed for Son to go to the treatment facility and signed the necessary paperwork. The trial court's final order states, "The parties agree that [Son] needs the therapy and that Husband's bad conduct caused the need for [Son's] therapy."

In its final order, the trial court noted Husband's argument that the court should "consider the fact that [Son] does not currently reside with Wife" when calculating its award of child support. Nevertheless, the trial court decided to base the child support award on two children and the number of residential days allocated to each parent in the parties' agreed parenting plan. The trial court was persuaded by the reasoning of **Brasfield v. Brasfield**, No. 03A01-9804-CH-00144, 1999 WL 366590 (Tenn. Ct. App. June 3, 1999) *perm. app. denied* (Tenn. Nov. 22, 1999). In that case, a father filed a petition to suspend his child support obligation because the children were enrolled in a boarding school, and he was paying for tuition and board there. *Id.* at *1–2. The mother opposed the petition because she still "had to maintain a home for them and contribute to their support." *Id.* at *1. Even though the children boarded at the school during the school year, the mother testified that she incurred hotel and travel expenses when visiting the children or picking them up for weekend or summer breaks. *Id.* The Court of Appeals held that the trial court erred in attempting to calculate the days the children were spending with the mother, when "the focus should have been on the reduction of the obligee's expenses, if any[.]" *Id.* at *2. We explained that the trial court failed to consider "the mother's ongoing expenses, as testified to at trial, including expenses of maintaining the home and buying clothing and other support items for the children." *Id.* Even though she would not be buying groceries or cooking meals for the children, she would continue to have "the expense of maintaining a residence for the children" and "the significant additional expense of travel, motels and visiting with the children while at school." *Id.* at *3. Focusing on the mother's expenses, we found no basis for suspending or reducing the father's child support obligation. *Id.*

Here, the trial court acknowledged that Wife might have some reduction in her costs for groceries or utilities, but it found that Wife visits Son at the treatment facility

once every three months for family weekend, and the cost of such a visit is $1,200.00 for airfare, hotel room, car rental, etc. Notably, these expenses nearly subsume the amount of support that is solely attributable to Son, which totals approximately $373.00 per month.[3] The trial court also noted that this is the second facility where Son has been treated, and if the parties could not afford the cost of the program, Son would have to return home. Accordingly, applying the reasoning of **Brasfield**, the court deemed it appropriate to base the child support award on the number of days specified in the parenting plan.

Husband argues on appeal that this Court reached a contrary result in **Benson v. Benson**, No. 01-A-01-9601-CV00043, 1996 WL 284731 (Tenn. Ct. App. May 31, 1996), and he asks this Court to follow **Benson** instead. However, the **Benson** case is procedurally distinguishable. In **Benson**, a mother filed a petition for contempt alleging that the father failed to pay his $433.00 monthly child support obligation, but the father had paid thousands of dollars to an inpatient facility and a halfway house where the child was housed during the relevant time period. **Id.** at *1. We explained that parents who are obligated to make child support payments may be entitled to a credit for voluntary payments made on behalf of the child for necessaries that the other parent either failed or refused to provide. **Id.** at *2. This rule "recognizes that the obligor parent provided the support the court ordered in the first place." **Id.** We note, however, that the trial court ruled that the cost of Son's treatment at the facility was not in the nature of support; rather, the trial court designated this obligation as a marital debt and assigned the debt solely to Husband. Husband has chosen not to take issue with the trial court's decision to classify this obligation as a debt, rather than a type of support. As such, regardless of the propriety of the decision, any issue regarding the trial court's treatment of this obligation is waived. **Hodge**, 382 S.W.3d at 335. Husband's obligation to pay for Son's treatment therefore does not constitute provision of the support already ordered, but simply service of a marital debt. **Benson** is therefore not analogous to the situation in this case.

### C.  Graduation Date

Next, Husband argues that the trial court erred by extending his child support obligation "beyond the children's normal graduation date." He suggests that Wife "designed the children's home schooling schedule in a manner which unnecessarily postpones their graduation (and hence the termination of the Husband's child support obligation) by one year." The record does not support these assertions. The trial court found that Wife told the children that they could repeat their current grade level because of the stress that the divorce put on the children. Wife explained that the children struggled with their grades during the divorce proceeding and that Son missed much of the year due to his treatment. There is no evidence to suggest that Wife manipulated the children's home school schedule to unnecessarily postpone their graduation.

---

[3] This figure is derived by subtracting the amount of support owed once Son reaches the age of majority from the amount of support owed for both children.

Furthermore, the trial court did not extend Husband's child support obligation in an inappropriate manner. Tennessee Code Annotated section 34-1-102(b) provides that a parent's duty of support continues "until the child graduates from high school or the class of which the child is a member *when the child attains eighteen (18) years of age* graduates, whichever occurs first." (emphasis added). The trial court's order cites this exact rule in awarding support in this case; given the decision to allow the children to repeat their current grades, application of this guideline supports the trial court's decision.[4] Moreover, Husband testified that he would be "in agreement" with extending child support until the children graduate home school "[a]s long as it's a reasonable amount of time." We cannot conclude that the trial court abused its discretion in ruling that one additional year of child support for Son to complete his high school education was reasonable under these circumstances.

### D. *Alimony in Futuro versus Rehabilitative Alimony*

Husband's next issue is whether the trial court erred by awarding Wife alimony in futuro instead of rehabilitative alimony. Husband suggests that Wife should only receive rehabilitative alimony for the next four years while the children are completing the home school program. Alternatively, he suggests that at least "a portion" of the alimony in futuro award should be designated as rehabilitative.

The Tennessee Supreme Court has repeatedly emphasized that "trial courts should be accorded wide discretion in determining matters of spousal support." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). In Tennessee, "trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Id.* These decisions are "factually driven" and require "the careful balancing of many factors." *Id.* On appeal, we are generally disinclined to second-guess the decision and limit our review to deciding "'whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable.'" *Id.* (quoting *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006)). Appellate courts presume that the trial court's decision as to spousal support is correct and review the evidence in the light most favorable to its decision. *Id.* at 105-06.

Our statutes reflect a legislative preference favoring short-term awards of spousal support over long-term awards whenever possible. *Id.* at 106 (citing Tenn. Code Ann. § 36-5-121(d)(2)–(3)). In appropriate circumstances, "rehabilitative alimony" can be awarded to an economically disadvantaged spouse to assist "in acquiring additional

---

[4] Indeed, Mother testified at trial that as of the January 2018 trial date, Son was "supposed to be" in 10th grade. As such, even setting aside the issue of repeated grades, it appears that Son would be in the 11th grade when he turns eighteen in February 2019. The class of which he is a part at that time would not be expected to graduate until May 2020. As such, Husband's argument that the child support is unreasonably extended appears to lack merit.

education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Id.* at 108. However, rehabilitation is not always feasible. "Alimony in futuro" is appropriate if the spouse will be "'unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.'" *Id.* at 107-08 (quoting Tenn. Code Ann. § 36-5-121(f)(1)). Tennessee Code Annotated section 36-5-121(i) provides a list of statutory factors for courts to consider when deciding whether to award spousal support and, if so, its nature, amount, and duration. *Id.* at 109. However, the two most important factors are "the disadvantaged spouse's need and the obligor spouse's ability to pay." *Id.* (quoting **Riggs v. Riggs**, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007)).

In this case, the trial court made detailed factual findings and specifically discussed each of the statutory factors. It found that Husband has an earning capacity of $9,939.17 per month compared to Wife's current earning capacity of $628.00 per month while finishing home school, and $1,256.00 per month thereafter. The court found that Wife was last employed earning around $20,000.00 per year. She had a GED and a cosmetology license but had not worked in a salon since years before the marriage. The court noted that the parties were married for eighteen years, with Wife being fifty-four years old at the time of trial, and Husband at the age of forty-two. Wife was designated primary residential parent for the children. Wife was in "fair health." She suffered from sleeplessness and anxiety and lost a tremendous amount of weight in a short time during the divorce proceeding. She still suffered from a repetitive motion injury, which impaired her ability to use her shoulder, elbows, and wrists. She also had knee and lower back problems from a car accident, as well as thyroid problems. Husband took hormone replacement therapy but was in good health. Both parties were awarded relatively small amounts of separate property, and Wife was awarded 57% of the marital estate, while Husband received 43%. The court found that the parties enjoyed a relatively high standard of living during the marriage. It found that both parties contributed significantly to the marriage, with Husband making monetary contributions and Wife working as a homemaker and caring for the children, which contributed to Husband's ability to increase his earning power. The court noted that Husband was at fault for the failure of the marriage. The court found that Wife "dedicated her life and gave up working to have the family," and Husband "just walked away and never looked back." It also considered that the alimony award would be taxable as income for Wife and deductible for Husband.

Considering all of the evidence, the trial court found that Wife cannot achieve, with reasonable effort, an earning capacity that will permit her standard of living after the divorce to be reasonably comparable to the post-divorce standard of living expected to be available to Husband. The evidence certainly supports the trial court's conclusion that alimony in futuro was warranted in this case.

### *E.* *Inability to Pay*

Finally, we consider Husband's argument that the trial court set his support awards at an amount that he is unable to pay.[5] The trial court ordered Husband to pay $3,000.00 per month in alimony in futuro. He would also owe a child support obligation for roughly four years, owing $1,501.00 per month until Son is expected to graduate (May 2020), then $1,128.00 per month until Daughter is expected to graduate (May 2022).

In its allocation of the marital debts, the trial court also ordered Husband "to pay all of the cost of [Son's] treatment, including the debt already incurred thus far for that treatment." At the time of trial, Son's treatment cost $1,500.00 per month, but it would increase to over $7,000.00 per month within a few months. The trial court noted that the parties had used credit cards to pay for some of Son's treatment but also found that "the parties owe approximately $87,000[.00] for [Son's] medical treatment." As previously discussed, Husband does not challenge the allocation of marital debt on appeal or the trial court's ruling regarding the cost of Son's treatment. However, the allocation of this debt to Husband must be considered in our analysis of Husband's ability to pay alimony. *See* Tenn. Code Ann. § 36-5-121(i)(1), (8).

Unfortunately, we cannot discern from the record precisely how this obligation will impact Husband's monthly expenses and his ability to pay alimony. When discussing the issue of alimony in its written order, the trial court simply referenced Husband's sworn income and expense statement and found that Husband "has expenses of $4,455[.00] per month, not including [Son's] medical treatment." Without any information about how Husband will be required to pay this post-divorce obligation, we cannot determine whether Husband has the ability to pay alimony in the sum of $3,000.00 per month. As a result, we deem it appropriate to vacate the award and remand this limited issue to the trial court for additional findings regarding Husband's ability to pay alimony in light of his further obligation to pay for Son's medical treatment. The trial court may receive additional evidence regarding this issue in its discretion.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed in part, vacated in part, and remanded. Costs of this appeal are taxed to the appellant, Richard John Griffith, for which execution may issue if necessary.

---

[5] In his brief on appeal, Husband acknowledges that a portion of his monthly expenses going forward may be "scheduled out through a Chapter 13 bankruptcy." The record before us contains a "Suggestion of Bankruptcy" filed in the trial court after the notice of appeal was filed. However, the record contains no other information about the bankruptcy proceeding.

_____
J. STEVEN STAFFORD, JUDGE