IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 27, 2021 Session

**STATE OF TENNESSEE v. FRANKLIN MONROE MCMILLAN**

**Appeal from the Circuit Court for Blount County**
**No. C25589   Tammy M. Harrington, Judge**

———————————————————

**No. E2020-00610-CCA-R3-CD**

———————————————————

Defendant, Franklin Monroe McMillan, was convicted by a jury of two counts of rape of a child and was sentenced by the trial court to a total effective sentence of eighty years.  On appeal, Defendant contends that the forensic interview of the child victim was erroneously admitted, that the trial court improperly denied his motion to exclude DNA evidence, and that the prosecutor made improper statements during closing rebuttal argument.  Following our review of the entire record, the briefs of the parties, and the arguments of counsel, we affirm the judgments of the trial court.

**Tenn. R. App. P.3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Benjamin James Reed, Maryville, Tennessee, (at trial and on appeal) for the appellant, Franklin Monroe McMillan.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Mike L. Flynn, District Attorney General; and Tyler Parks and Ashley Salem, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

The underlying crimes came to light during a family gathering hosted by Defendant and his wife in their new home in Maryville on September 17, 2017. In order to protect the minor victim, she will be referred to solely throughout this opinion as "the victim." Additionally, we will refer to the victim's mother and other members of the victim's immediate family by their relationship to the victim.

*Pretrial Hearing on State's Motion to Enter the Victim's Forensic Interview Video – July 11, 2018*

Christina Copland, the forensic interviewer at the New Hope Blount County Children's Advocacy Center ("CAC"), testified to her professional background, duties as a forensic interviewer, and the CAC's services for child sex abuse victims. *See* T.C.A. § 24-7-123(b)(3). Ms. Copland stated that she interviewed the victim on September 18, 2017, based on a complaint of child sex abuse. The interview was conducted the day after the incident had reportedly occurred. Ms. Copland interviewed the victim alone in a room equipped with audio and video devices dedicated to forensic interviews. Prior to her testimony at the hearing, Ms. Copland had watched the recording of the victim's forensic interview. She testified that the recording clearly identified the victim and her visually and audibly, that the recording was unaltered, and that the recording accurately documented the entire interview.

The victim, age seven at the time of the offense, testified that she understood the difference between telling the truth and telling a lie. She recalled watching a video in the prosecutor's office the week before the hearing. The video was of herself and "Ms. Shannon." She had watched this video twice. She testified that she was telling the truth when talking to "Ms. Shannon." On cross-examination, the defense tried to clarify the name of the forensic interviewer. When asked whether she talked to Ms. Copland, the victim answered, "no," and testified that she was interviewed by "Ms. Tina." In the video, Ms. Copland introduces herself as "Tina." The victim recalled that her parents took her to the interview and that the interview occurred in the afternoon.

The defense did not challenge Ms. Copland's professional background, the adequacy of the CAC's facilities, or the authentication of the interview "given the proof that the State presented" at the hearing. However, the defense indicated that it "may have some argument" for "limiting the use of the forensic interview at trial" depending on the trial court's findings. The trial court stated that it would bifurcate the proceeding as follows: "[L]et me look at the video, and then we'll come back and I'll allow you to argue further before I make a final ruling." The State agreed that if the court's ruling allowed the video to be admitted, portions of the interview would need to be edited before exhibiting it at trial. If there was another hearing regarding the admissibility of the victim's forensic

interview, there is no transcript in the record; nor is there an order from the trial court ruling on the State's motion.

However, when later ruling on Defendant's motion for new trial, the trial court held:

[W]e had a pretrial hearing and this Court determined that all of the pretrial requirements were met, including the child authenticating the statement as true and authentic. And the other requirement – in addition to other requirements[.]

*Pretrial Hearing on Defendant's Motion in Limine to Exclude DNA Evidence – March 5, 2019*

The parties stipulated that on September 17, 2017, the victim was in the presence of three male relatives: Defendant, the victim's stepfather who was Defendant's biological adult son ("Stepfather"), and Defendant's biological minor son, and that the victim was in the presence of Stepfather in their shared residence on September 18, 2017. The parties further stipulated that the victim's clothes were received by the Blount County Sheriff's Office ("BCSO") on September 18, 2017, and subsequently tested by Special Agent Terra Asbury, an expert in forensic biology and DNA serology at the Tennessee Bureau of Investigation ("TBI").

Special Agent Asbury testified that she tested two pairs of underwear and one pair of shorts using autosomal and Y-STR testing. For comparison, Agent Asbury received DNA samples from the victim, Defendant, and Stepfather. Agent Asbury testified that she conducted the tests for the purpose of "looking for touch DNA and not bodily fluids[.]" She explained that it is "a lot harder" to obtain a DNA profile from touch DNA than from bodily fluids:

Touch DNA is from skin cells. Everybody deposits skin cells, everybody sheds skin cells. Bodily fluids contain a much greater source of DNA because they are concentrated with white blood cells and other sources of DNA. But skin cells are – you're limited to what is actually shed. So it's a lot harder to get a touch DNA profile than it is from bodily fluid.

In order to obtain touch DNA, Agent Asbury scraped the underwear and shorts to "release any cellular material" and "swabbed it to collect the cells onto the swab." She then processed what was collected on the swabs to generate a DNA profile.

Agent Asbury explained that autosomal testing "look[s] at 23 different chromosomes within a person and different locations on these chromosomes" and that

- 3 -

autosomal testing is not effective at identifying male DNA where female DNA "overwhelm[s]" the male DNA profile as it occurred in this case. For this reason, Agent Asbury conducted Y-STR testing which identifies and analyzes the Y chromosome, which is passed down from father to male child. She testified that barring random mutations, all men in a paternal lineage will possess the same Y-STR DNA profile. Thus fathers, sons, brothers, uncles, and paternal cousins cannot be distinguished from one another through a Y-STR DNA profile. For this reason, Y-STR testing is somewhat limited in that it does not positively identify an individual; however, Y-STR testing is useful in excluding someone since an individual cannot be the source of the DNA if the profiles do not match. If the Y-STR DNA profiles do match, then all that can be said is that the individual cannot be excluded as the DNA donor.

Agent Asbury testified that in this case, the results of the autosomal tests were inconclusive and only showed evidence of the victim's DNA profile. The Y-STR test was more definitive and yielded a Y-STR DNA profile on one pair of underwear and one pair of shorts. This profile matched both Defendant and Stepfather. The DNA profile found on the second pair of underwear matched the victim's DNA profile and the DNA profile of Defendant and Stepfather. Agent Asbury reiterated that one would "expect from any parental lineage that the Y-STR profiles would be the same because it's an exact copy that's passed down from father to son."

On cross-examination, Agent Asbury confirmed that but for one pair of underwear, the Y-STR profile was consistent with a mixture of at least two males of unknown DNA profile meaning that the mixture was a "completely separate profile" from Defendant and Stepfather. Agent Asbury testified that "a casual touch" is not likely to generate a full DNA profile.

Kelly Hoard, a detective in the criminal investigation division of the BCSO testified that he answered the call on September 17, 2017, regarding the sexual assault allegation in the case and instructed an officer to request a referral for the victim to be forensically interviewed. Detective Hoard did not advise the officer to collect any evidence because he was under the impression that the assaults occurred "outside of the clothes" and did not involve penetration. Detective Hoard learned that the assault involved penetration from watching the victim's forensic interview. Detective Hoard explained that when evidence needs to be collected, he will order a crime scene investigator to the relevant location and collect anything that needs to be collected. In this case, the victim's mother handed him a bag of the victim's clothes immediately following the victim's forensic interview. The victim's mother told Detective Hoard that the bag contained the clothes the victim wore the previous day: two pairs of underwear and a pair of shorts. He did not recall asking her why there were two pairs of underwear and did not recall the victim's mother offering an explanation. He also did not recall asking the victim's mother to bring evidence to the

interview. He denied that he examined the clothes in the bag because doing so would have contaminated the evidence with his DNA. Upon receipt of the bag, Detective Hoard "drove straight" to the Blount County Justice Center, where it was secured in the crime scene laboratory.

*Trial – March 26-27, 2019*

Defendant and victim are members of the same extended family. The jury heard testimony from, among others, the victim who was seven years old at the time of the crimes and eight at the time of trial; the victim's mother, and the victim's aunt. Victim's mother, ("Mother") was married to Defendant's son, previously identified as Stepfather. Mother's sister and the victim's aunt ("Aunt") was married to Defendant. The victim referred to Defendant as "Pete" or "Uncle Pete." Accordingly, Defendant is both the victim's uncle through his marriage to Aunt and the victim's step-grandfather through Stepfather's marriage to Mother.

Mother was the State's first witness. She described the family relationships discussed above. She testified that on the afternoon of September 17, 2017, she went to Defendant and Aunt's house in Maryville with Stepfather, the victim, and the victim's sibling for a family dinner. There were five adults and seven children at the family gathering. The adults were Defendant, Aunt, Mother, Stepfather, and Stepfather's mother. The seven children included the victim, her sibling, Stepfather's niece, and the four minor children of Defendant and Aunt.

Mother testified that she was preparing the meal and catching up with the others when she heard Defendant say that he was going out to buy some ice because his ice maker was not working. She learned about twenty minutes later that Defendant had taken the victim with him. When Defendant and the victim returned from buying ice she went to the back porch to greet them. Mother testified that the victim quickly exited the truck ahead of Defendant and ran up the ramp leading to the back porch, "whimpering and crying." Mother suspected that something was wrong, so she took the victim to the back bathroom so the two of them could talk privately. Mother testified that once they were inside the bathroom, the victim continued to cry and "sh[ook] like a leaf on a tree" as if she were afraid. When Mother asked what had happened, the victim replied that "Uncle Pete (Defendant) touched [her]."

Mother then yelled for her sister, Aunt to come to the bathroom. When Aunt entered the bathroom, Mother asked the victim what Defendant had done, and the victim again replied that Defendant had touched her but declined to say more. Mother asked the victim to show her how Defendant had touched her. According to Mother, the victim reached for Aunt's "private area." While the victim was demonstrating, Defendant was knocking on

the bathroom door and asking "where's [the victim]?" When Mother told him to go away, Defendant remained outside the bathroom and asked if someone needed toilet paper. Although no one wanted him to enter the bathroom or asked for toilet paper, Defendant managed to "pop" open the door which Mother had locked. Defendant tried to find out what was going on. Mother "cursed" at Defendant because she was "so upset." She grabbed the victim, ordered Stepfather, and her other child, to follow her outside and all of them left together. She covered the victim's face so the victim would not have to face Defendant. She recalled that the victim was still shaking.

Mother drove away but pulled over to dial 911. After she spoke to an officer, an appointment was made for the victim at the CAC the next morning. After she ended the call with the officer, Mother drove home where she collected the clothes the victim wore that day and put them in a plastic shopping bag. Mother took the victim to the CAC the following day. While there, she handed the victim's bag of clothes to Detective Hoard.

On cross-examination, Mother denied that she or Aunt pulled down victim's shorts or underwear to inspect the victim for injuries while they were in the bathroom. She testified that she reported to the police that the victim had been touched. She did not say that the victim had been penetrated. Mother was asked whether she recalled testifying at the preliminary hearing on December 8, 2017, that she and Aunt tried to visually inspect the victim for possible injuries. She acknowledged that she may have said that her sister tried to inspect the victim. She explained that she could not specifically recall her testimony from the hearing because "[i]t's been a long time since all this."

Mother did recall telling the police that the victim had been touched but not penetrated. She did not specifically recall the police instructing her to collect any clothing. However, when they returned home, Mother removed the victim's clothing, and put them in a bag. She vaguely recalled collecting a shirt, a pair of shorts, and a pair of underwear. She did not remember collecting two pairs of underwear. She acknowledged that she may have "grabbed more" clothing and put the additional clothing in the bag.

Aunt confirmed that she and Defendant had a gathering in their new home on September 17, 2017, with several family members attending including the victim, Mother, and Stepfather. Aunt described victim's relationship with Defendant as "great" and added that Defendant was victim's "favorite uncle." Aunt was aware that the victim went with Defendant to Dollar General to purchase some ice. Aunt testified that she went to the bathroom when Mother called her. When she entered the bathroom, the victim was "upset, shaking and crying." Mother was "pretty mad and upset." Aunt asked the victim what was making her cry, and the victim answered that Defendant had "touched her." Aunt recalled that the victim was "too scared" to show where Defendant had touched her. The victim did not feel comfortable demonstrating on Aunt so Mother pretended to be the victim. The

victim then pointed to Mother's "private part." Aunt testified that she and Mother then "checked" the victim by having her lay down on the floor. Neither she nor Mother could see any injuries. Aunt testified that the situation "blew up" when Defendant unlocked the bathroom door and handed them a roll of toilet paper. She recalled that Mother "started going off on him right away." According to Aunt, Defendant appeared equally "shocked" and "surprised."

On cross-examination, Aunt testified that she did not immediately see the victim when she and Defendant returned from Dollar General. She clarified that during their inspection, she and Mother pulled down the victim's pants and underwear just enough "to expose her private area." They did not see "visible evidence" of injury. She was uncertain whether the victim's underwear touched the bathroom floor while she was lying down.

Cody Russell, an officer in the Alcoa Police Department testified that he was the BCSO school resource officer at two elementary schools on September 18, 2017, when he came into contact with Defendant who had come to the school to pick up his children. On that particular day, Defendant approached Officer Russell and told him that his niece had made some "allegations" against him. Defendant asked Officer Russell whether a man convicted of "allegations" could go to prison. Defendant did not tell him what accusations had been made against him. Officer Russell did not recall asking him about the investigation or who he should contact about the case.

Detective Hoard's trial testimony was similar to his testimony at the pretrial hearing on the DNA evidence. He testified that he took the call on September 17, 2017, regarding "an accusation of sexual contact" by a "female juvenile." He explained why officers do not interview child victims in sex abuse cases:

> [W]e have people at the [CAC] that is trained to deal and talk to juveniles, which we refer to as a forensic interview. Something that we try to do is not have the child have to tell the story to a patrol officer and a detective and have to tell it over and over and over. That's why we do forensic interviews.

Detective Hoard confirmed that the same protocol was followed in this case. Tina Copland, the CAC forensic interviewer, interviewed the victim and Detective Hoard watched from a separate room. After the interview, Detective Hoard met Mother who handed him a bag of the clothes the victim wore when she was assaulted. He adamantly denied that he opened the bag and inspected the clothes. He explained that doing so would contaminate the clothes with his DNA. Once he received the bag, he drove to the Justice Center and turned it over to the crime scene investigator, Andy Waters, who secured the bag and sealed it as evidence.

On cross-examination, Detective Hoard denied that he instructed Mother to collect any clothing because he thought the sexual contact occurred over the clothes. Detective Hoard first learned what was inside the bag when he received the TBI DNA test report on the clothes.

Crime scene investigator, Andy Waters, testified that he received a plastic bag with clothes from Detective Hoard. He removed the clothes from the plastic bag while wearing a pair of clean gloves "[b]ecause DNA can spoil and mold if it's in plastic." He then put the clothes in a paper bag and sealed them into evidence and for submission to the TBI. At trial, he identified the bag which contained two pairs of underwear and a pair of leopard print shorts.

Stephanie Shults, M.D., testified as an expert in pediatric medicine without objection. Dr. Shults conducted a head-to-toe, forensic medical examination of the victim on September 18, 2017. Dr. Shults checked the genital area for abnormalities, lacerations, or bruising. She clarified that she does "not go inside" or conduct a pelvic exam as part of the forensic medical examination. Dr. Shults's report of the victim's medical exam was entered into evidence. Dr. Shults noted in her report that the Mother reported "no sores in the mouth," and "no discharge or rash in labial/vaginal area." Dr. Shults observed no signs of trauma or infection and there were no findings of infection or abnormalities in the victim's bloodwork. Dr. Shults testified that in her experience, it is not uncommon for the lack of abnormal findings in a seven-year-old child who alleges digital penetration or oral penetration because "[t]hose areas are very flexible and digital penetration doesn't normally cause trauma."

The victim was eight years old at the time of trial. She testified that she understood "the difference between the truth and a lie." She identified Defendant in the courtroom. She recalled talking to "Ms. Tina" or Ms. Copland at the CAC. She stated that she told Ms. Copland the truth and denied that she told her anything that was untruthful. She recalled that her conversation with Ms. Copland was recorded on a video which she had watched the week before trial. She reiterated that everything she said on the video was the truth. Based on an agreement prior to trial, the victim was permitted to step down from the witness stand during the playing of the video without objection.

During the forensic interview, the victim agreed to tell Ms. Copland the truth and to correct Ms. Copland if she said something incorrect. After much hesitation, and ten minutes into the interview, the victim reluctantly told Ms. Copland that she was there to talk about her "Uncle Pete." The victim described two incidents. One incident occurred on the way to Dollar General and the other occurred on the drive back to Defendant's house after Defendant purchased ice at Dollar General. Both incidents occurred in Defendant's truck.

The victim stated that she went to Aunt's house the day before the interview with her parents and her sibling. She was watching television with two of her relatives when Defendant told her to come with him to Dollar General. The victim initially ignored him but he insisted that she go with him. The victim's sibling wanted to come along but Defendant refused and dismissed him in a "mean" tone.

The victim told Defendant that she still did not want to go with him but he "peeled" out before she could exit his old, red and white truck. She recalled it was still light outside when they left for Dollar General. On the way to the store, the victim sat in the passenger seat. Defendant started "talking about nasty stuff," saying how "he want[ed] to touch my private." The victim said that defendant used a "bad word" to describe her "private." Because she was not comfortable saying the "bad word," she wrote it on a whiteboard in the room. On the video, the victim can be seen trying to spell out the word, "pussy." A photograph of the whiteboard was admitted into evidence without objection. Because he was "talking about nasty stuff," the victim tried to ignore Defendant by "looking out the window and being so quiet like a mouse."

In the interview, the victim stated that with one hand on the steering wheel, Defendant reached toward her and started "messing" with her "private part." She stated that Defendant put one finger under her "cheetah shorts," and under her orange and white underwear, and then "turned his finger straight into [her] private part." The victim stated Defendant put the "tip of his finger . . . inside my private part" and "mov[ed] his finger side to side." The victim "jumped" because it "hurt." When the victim "jumped," Defendant removed his hand from underneath her clothing and put it back on the steering wheel.

When they got to Dollar General, they both went inside, and Defendant paid for the ice. The victim recalled that it was getting dark outside when they left the store. On the drive from the store, the victim sat in the middle front seat of Defendant's truck. The victim stated that Defendant started "doing the same stuff." When Ms. Copland asked her to clarify "the same stuff," the victim began to cry. At this point, Ms. Copland grabbed a "heavy" blanket and covered the victim. She explained to the victim that the blanket is used to make people feel comfortable. The victim continued to wipe the tears from her face and recounted how Defendant unzipped his shorts and "made [her] touch his private part." The victim wrote the word "dick" on the whiteboard to describe the word Defendant used for "his private part" because she did not want to say it out loud. She tearfully recalled how Defendant asked her if she wanted to touch his "private part" and that although she replied no, "he made [her] touch it anyway." Using hand gestures, the victim tearfully described how Defendant grabbed both sides of her head and forced her head in the direction of his penis. She added, "I know this is a little weird, but he made me suck it."

She stated that his penis went inside her mouth and she "tasted sour stuff." The victim said that "he wanted my head to go up and down."

When asked to explain how Defendant was able to maintain control of his truck during this incident, the victim stated that he tried to steer with his knees. She felt the truck swerve over the road and thought that they would get pulled over, but "no cop was behind [them]." The victim stated that Defendant stopped forcing her from putting his penis in her mouth right before they reached his house. She stated that Defendant warned her not to tell anyone. Because she was crying so hard, it is difficult to make out what she said in response to this threat. Clearly uncomfortable, the victim asked Ms. Copland, "When is this over?" Shortly afterwards, Ms. Copland left the interview room and the interview ended.

The State asked no further questions and passed the victim as its witness. The victim returned to the stand where the defense began its cross-examination. Regarding the day of the incidents, the victim recalled going to Aunt's house to eat tacos and watch television with one of her cousins before going to Dollar General.

The defense began asking the victim a series of open-ended questions about the incidents when she mentioned going to Dollar General:

| Defense counsel: | And then you mentioned you went to the Dollar General? |
|---|---|
| The victim: | Yes. |
| Defense Counsel: | So tell me about that. |
| The Victim: | (Pause.) I don't remember. |
| Defense Counsel: | So you went to the Dollar General, but you don't remember what happened? |
| The Victim: | (Pause.) No. |
| The Court: | I didn't hear you. What did you say? |
| The Victim: | No. |
| Defense Counsel: | Do you know who you went to the Dollar General with? |

The Victim:        Uncle Pete.

Defense Counsel:   So you can't tell me about what happened?

The Victim:        (No response.)

Defense Counsel:   And did you get to Dollar General?

The Victim:        Yes.

Defense Counsel:   And so what happened at the Dollar General?

The Victim:        We bought ice.

Defense Counsel:   And why did you – do you know why you had to go buy ice?

The Victim:        No.

Defense Counsel:   No?  And so who bought ice, Uncle Pete?

The Victim:        Yes.

Defense Counsel:   And then what happened?

The Victim:        We got in the truck and went back to the house.

Defense Counsel:   And you went back to the house?  And once you got back to the house, what happened?

The Victim:        What do you mean, what happened?

Defense Counsel:   So I'm just asking you to tell me in your own words what happened when you got back there?  So, you know, earlier when I asked you what you went over to the house to do, you said you went over there to eat, that you were watching TV in the living room, that other people were outside.  So I'm just wondering – but you did tell me you went to the Dollar General. So you went to the Dollar General to get ice, you came back.  What happened once you got back to the house?

- 11 -

| | |
|---|---|
| The Victim: | We left. |
| Defense Counsel: | So you got home, got out of the truck, and then you talked – what – how did you get home?  I mean, so what happened between when you got home – or, not home, I'm sorry.  Let me rephrase.  What happened once you got back to Aunt['s] house, what happened after that?  You went home, but what happened between getting back to Aunt['s] house and going home? |
| The Victim: | (Pause). |

The transcript reflects that the trial court stepped in and asked the victim if she needed a Kleenex or a drink of water.  The trial court then reminded the victim of the oath she took to answer questions at the beginning of her testimony and whether she could continue to testify.  The transcript does not indicate whether the victim answered the trial judge's questions because the trial court then pivoted to defense counsel and advised counsel to ask more specific questions.

Although defense counsel asked more specific questions, the victim was not more forthcoming.

| | |
|---|---|
| Defense Counsel: | And then what happened when you got inside? |
| The Victim: | I went to the bathroom. |
| Defense Counsel: | And who did you go to the bathroom with? |
| The Victim: | My mama. |
| Defense Counsel: | And then what happened in the bathroom? |
| The Victim: | I told her what happened. |
| Defense Counsel: | And then how long do you think – was it just you and your mom in the bathroom? |
| The Victim: | Yes. |
| Defense Counsel: | And how long do you think you were in the bathroom? |

The Victim: I don't know.

Defense Counsel: And so what did you tell your mom in the bathroom when it was just you and her?

The Victim: (No response.)

Defense Counsel: Did your mom eventually get anybody else to come into the bathroom?

The Victim: My Aunt.

…

Defense Counsel: And then what did you and Aunt and your mom talk about?

The Victim: What happened.

Defense Counsel: Okay. And then did they ask you to do anything, to show them what happened?

The Victim: To show them what happened.

Defense Counsel: Now, when you say that, what do you mean?

The Victim: (No response.)

Defense Counsel: Did they ask you to get down on the floor or anything like that?

The Victim: Yes.

***

Defense Counsel: Okay. And what did you do while you were on the railing [of the bathtub]?

The Victim: I showed my mom and aunt what happened.

- 13 -

| | |
|---|---|
| Defense Counsel: | Okay. And did your aunt or your mom at that point ever ask you to get onto the ground? |
| The Victim: | No. |
| Defense Counsel: | And so did they ever pull down your underwear and ask to inspect any part of your body that may be a private part that is appropriate for the bathroom? |
| The Victim: | No . . . |
| Defense Counsel: | So you showed them what happened. So what happened next as far as – specifically about the bathroom. Because you mentioned at some point we know you left. So what happened after you were in the bathroom? |
| The Victim: | After I got done telling them what happened, my mom told everybody to go outside that we took there. And we all got in the car and left. |

Pursuant to defense questioning, the victim testified that they stopped "somewhere" and her mother called the police. The police arrived and talked to her parents but she was not aware of what was said. Afterwards, she and her family drove home where she removed her clothing and put on some "nightclothes." She shook her head when asked whether she knew if her mother had done something with her clothes. The defense finished its questioning. The State did not re-direct the victim. The record shows that the victim was the last witness to testify that day. Accordingly, the jury was excused following her testimony. After the jury was excused, the State asked whether the victim could be excused from appearing in court for trial the next day for her to attend school. The defense did not object.

Special Agent Terra Asbury's trial testimony was similar to her testimony at the pretrial hearing on DNA evidence. Agent Asbury testified as an expert in forensic biology and DNA serology without objection. The jury heard Agent Asbury's explanation regarding the two different types of DNA testing, Y-STR and autosomal testing.

In this case, Agent Asbury received two pairs of underwear and a pair of shorts for DNA testing. Agent Asbury referred to her initial forensic biology report and explained that she "did not perform an examination" and recommended that the items "would be more suitable for Y-STR testing" due to the "overwhelm[ing]" presence of female DNA.

She clarified that she looked for skin cells or "touch DNA," and not blood or bodily fluids. Agent Asbury tested the inside front of each pair of underwear and the shorts because it was the area with the "most friction" and based on the narrative she received about the case. She agreed that skin cells may transfer to clothing depending on the circumstances. She explained, "If you're wearing it and there's a lot of friction, then you're going to get a lot of skin cells deposited onto clothing." She added however, that it is "very unlikely to get a full DNA profile from just causal touch."

Agent Asbury compared the results of the Y-STR tests to the DNA samples provided by the victim, Defendant, and Stepfather and testified that one pair of underwear contained a DNA profile consistent with the mixture of "at least two males." Defendant's DNA profile matched the profile of the major contributor. She explained that Defendant and Stepfather shared the same DNA profile. Thus, barring a mutation, neither of his "paternal male relatives" could be excluded as the source of the DNA profile found on the underwear. The results were inconclusive on the second pair of underwear due to the limited presence of DNA. Defendant could not be excluded as the source of the male DNA found on the shorts and barring a mutation, Defendant's paternal male relatives could not be excluded either.

On cross-examination, Agent Asbury acknowledged that Y-STR testing does not specifically identify Defendant. Rather, Defendant could not be excluded as the source of the DNA found on the clothes. She agreed that it is "possible" for DNA to be deposited onto clothing from bodily fluids by using a common bathroom, but "very unlikely." On redirect examination, Agent Asbury testified that she did not test for bodily fluids in this case. She confirmed that she tested for "touch DNA."

The State rested its case. Defendant moved for judgment of acquittal arguing that "the [victim's] testimony on cross examination" lacked corroborating evidence of penetration. The trial court denied the motion based on the testimony of Mother, Defendant's statement to a school officer, the DNA evidence, and the forensic interview.

Defendant did not testify but played the surveillance video from Dollar General showing him and the victim arriving at the store, purchasing ice at the register, and exiting the store.

During closing argument, defense counsel told the jury that there was "no opportunity for the [d]efense to examine – or cross examine [the victim]." Defense counsel reminded the jury that the victim's status as a child did not give her a special dispensation against trial "procedure." Defense counsel then used the victim's "silences" to discredit her "in-court testimony":

I told you that I believed the in-court testimony would be extremely important and that plenty of weight should be given to this in-court testimony. What happens? Silence. [The victim] said they went to the Dollar General. What happened then? Silence. You go to the store and bought ice. What happened then? Silence. We got home. What happened then? Silence.

And because she remained silent, defense counsel argued that the victim failed to corroborate the allegations of penetration during her testimony:

So the main witness in this case when subject to – the first time she was subject to any push back on cross examination and one of the few opportunities the Defense has ever had to confront the witness, she says almost nothing. She doesn't corroborate any allegations of penetration or corroborate any other allegations. She's virtually silent the entire time.

As for the DNA evidence, the defense argued that "it doesn't really prove anything in this case," because it could not exclude Stepfather who lived with the victim and whose DNA might have transferred to the victim's clothes in their shared home or Defendant's home during the family gathering.

After the defense had finished its argument and outside the presence of the jury, the State objected to defense counsel's statement about the lack of opportunity to cross-examine the victim and moved for a curative instruction. The trial court recalled the same comment but declined to give a curative instruction. The court instead advised the prosecutor to address the matter in the State's rebuttal closing argument.

The State responded to the attacks on the victim's "in-court testimony" and addressed the argument that the defense was unable to cross-examine her as follows:

What did she testify to? You were sitting here. She answered every question. Going to the Dollar General. Being at the house, what they were doing at the house, being in the bathroom with her mom where she told her mom what he did to her.

The jury convicted Defendant of the indicted charges. At sentencing, the trial court sentenced Defendant, a multiple offender to forty years on each count to be served consecutively to each other for a total effective sentence of eighty years at 100% by operation of law. In his motion for new trial, Defendant claimed for the first time that the victim's failure to answer questions about the offenses on cross-examination violated the Confrontation Clause and that prosecutor "mischaracterized" Agent Asbury's testimony

on closing rebuttal argument. Defendant did not challenge the admission of the DNA evidence. The trial court denied Defendant's motion for new trial and Defendant filed a premature but timely appeal to this court.

## Analysis

## Scope of Review

In the Statement of Issues section of his brief, Defendant presents three issues: (1) whether the victim's testimony on cross-examination satisfied the availability requirement of Tennessee Code Annotated section 24-7-123(b)(1); (2) whether the prosecutor made improper statements mischaracterizing DNA evidence during closing argument; and (3) whether the evidence is sufficient to support his convictions. The issues in Defendant's Issue Statement do not correspond to the issues he addresses in the Argument section of his brief. Notably, he raises a fourth issue not presented in his Issue Statement: whether the trial court erred in denying Defendant's motion in limine to exclude the DNA evidence. Relying on *Hodge v. Craig*, 382 S.W.3d 325 (Tenn. 2012), the State contends that this issue is waived in part, because it is not presented as an issue for review in the Statement of the Issues. The State also contends that the sufficiency issue is waived because Defendant failed to address it in the argument section of his brief despite its presentation as an issue for review in the Issue Statement.

"[P]arties must thoroughly brief the issues they expect the appellate courts to consider." *Waters v. Farr,* 291 S.W.3d 873, 919 (Tenn. 2009). Rule 27(a)(4) of the Tennessee Rules of Appellate Procedure requires that an appellant's brief include a statement of the issues presented for review. "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn[essee] R[ule] App[ellate] P[rocedure] 27(a)(4)." *Hodge*, 382 S.W.3d at 335. Moreover, "[a]n issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7)." *Id.* at 335. Failure to cite authority to support an argument qualifies for waiver of an issue. *See* Tenn. R. App. P. 27(a)(7) (an appellant's brief must contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on"); *see also* Tenn. Ct. Crim. App. R. 10(b) ("[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

Each of the issues set out in Appellant's brief in both the Statement of Issues and the Argument section presents issues of waiver. We will address each in kind and consider whether the issues are entitled to plain error review.

## I.      Admissibility of the Victim's Forensic Interview Video

Defendant objects to the admission of the videotaped forensic interview because the victim failed to answer questions about the offenses on cross-examination. Thus, he argues, the victim was "unavailable" for cross-examination as contemplated by Tennessee Code Annotated section 24-7-123(b)(1) and the Confrontation Clause. The State responds that Defendant waived this issue by failing to object contemporaneously at trial. The State contends that should this court review this issue, Defendant is entitled to no relief because Defendant failed to establish the existence of plain error. The record shows that Defendant did not object at trial, but raised the issue in his motion for new trial. However, Defendant did not address the issue for plain error in his brief or respond to the State's waiver argument in a reply brief. Instead, he waited for oral argument to argue for the first time that the admission of the video constituted plain error. An issue is waived where it is raised for the first time at oral argument. *State v. Henry,* 539 S.W.3d 223, 250-51 (Tenn. Crim. App. 2017*)*; *State v. McCormick*, 494 S.W.3d 673, 679, n.6 (Tenn. 2016) (argument raised for the first time at oral argument waived).

At oral argument, Defendant offered no grounds for excusing the forfeiture of the plain error argument. This issue is therefore waived. However, because interpretation of the statute is at issue, we exercise our discretion and consider Defendant's belated argument for plain error. *See e.g., State v. Minor,* 546 S.W.3d 59, 65 (Tenn. 2018); *Henry,* 539 S.W.3d at 250-51.

"The plain error doctrine has long been recognized as a necessary exception to these requirements, which affords appellate courts discretion to review unpreserved errors and grant relief when fairness and justice demand." *Minor*, 546 S.W.3d at 65. However, the plain error doctrine must be exercised "sparingly." *Id.* at 66. To demonstrate plain error, Defendant must prove all of the following five factors: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin,* 505 S.W.3d 492, 504 (Tenn. 2016)); *Minor*, 546 S.W.3d 67. "[A]n appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020); *Minor*, 546 S.W.3d 67 (citing *State v. Knowles*, 470 S.W.3d 416, 425 (Tenn. 2015)). The complained-of error must have been of "sufficient magnitude that it probably changed the

outcome of the trial." *Vance*, 596 S.W.3d at 254 (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

At issue is the admission of the victim's forensic interview video under Tennessee Code Annotated section 24-7-123(a) which states:

[A] video recording of a child by a forensic interviewer containing a statement made by the child under thirteen years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

Here, Defendant is challenging the admission of the forensic video based on the following requirement:

A video recording of a forensic interview may be admitted if: The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and *the child is available for cross examination*[.]

*Id.* § 24-7-123(b) (emphasis added). In *State v. McCoy*, 459 S.W.3d 1, 16 (Tenn. 2014), the supreme court held that "notwithstanding the testimonial nature of video-recorded statements taken pursuant to Tennessee Code Annotated section 24-7-123, the admission of these statements does not violate a defendant's right of confrontation so long as the child witness authenticates the video recording and appears for cross-examination at trial, as required by our statute."

In *McCoy*, the supreme court emphasized "opportunity" for effective cross-examination as the key element in describing a child witness who is available under the Confrontation Clause and the statute. *McCoy*, 459 S.W.3d at 15. The record shows that Defendant did not object contemporaneously to the victim's cross-examination testimony at trial, did not object to the admissibility of the forensic interview, did not object to allowing the victim to step down from the witness box after she answered foundational questions about the forensic interview, nor did he ask the victim any of the questions he argues in his brief that the victim refused to answer. Defendant did raise the admissibility of the forensic interview as an issue in his motion for new trial. At the hearing on the motion for new trial, the trial court held that the victim's testimony satisfied the statute's availability requirement and the Confrontation Clause because at trial, the victim was called to the stand for cross-examination after the forensic interview video was played for the jury. In its ruling, the trial court stated:

In this case, the Court was very, I guess, oriented and attentive to the child's testimony . . . . And what's not in the record is a lot of demeanor, physical action, physical responses, long pauses and struggles, emotion, attempts to speak and try to answer questions. So as I sat there and knowing that I'm sitting as a thirteenth juror, it was important to pay close attention and as I watched, the Jurors paid very close attention to that cross examination. And quite frankly, those responses and answers could have been interpreted as favorable to the Defendant at times. Or unfavorable. And so there was a lot beyond just what the answers were to the questions.

Even when a trial court admits a witness' hearsay statements as substantive evidence, and the witness claims at trial not to remember the information contained within the hearsay statements, the Confrontation Clause is not violated when a defendant has an opportunity to cross-examine the witness at trial. *State v. Davis*, 466 S.W.3d 49 (Tenn. 2015). *See Bugh v. Mitchell,* 329 F.3d 496, 508–11 (6th Cir. 2003) (holding that the defendant's right of confrontation was not violated by adult witnesses testifying about child victim's out-of-court statements implicating defendant because child, although exhibiting some lack of memory, testified at trial and was available for cross-examination); *Diggs v. United States,* 28 A.3d 585, 594 (D.C.2011) (stating that "memory loss, whether genuine or feigned, does not deprive the defendant of the meaningful opportunity to cross-examine that the Confrontation Clause requires"); *State v. Ackerman,* 397 S.W.3d 617, 641 (Tenn.Crim.App.2012) (holding that admission of victim's out-of-court statement did not violate the defendant's federal or state confrontation rights because victim testified at trial, notwithstanding victim's "nearly complete lack of memory"), *overruled on other grounds by State v. Sanders,* 452 S.W.3d 300, 315 n.11 (Tenn.2014).

The victim's testimony in this case did not violate Defendant's right to confront witnesses. The law requires only that the victim be available at trial to testify. She was available to testify and, in fact, testified at trial, subject to cross-examination. Defendant's opportunity to question the victim was unfettered. The trial court imposed no restrictions on Defendant's cross-examination of the victim. *See State v. Reid,* 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994) ("a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation"). Because Defendant's right to confront witnesses was not violated, the availability requirement of T.C.A. § 24-7-123(b) was not breached and no rule of law was breached. There is no plain error and Defendant is not entitled to relief.

## II.    Motion to Exclude DNA evidence

Defendant argues that the results of the Y-STR test on the victim's clothes should have been excluded under Tennessee Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice. The State responds that this issue is waived because Defendant failed to raise it in his motion for new trial and failed to identify it as an issue in the "Statement of the Issues" section of his brief as discussed previously. At oral argument, Defendant did not address whether this issue was waived at oral argument. We agree with the State that Defendant waived consideration of this issue by failing to raise it in his motion for new trial. "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." *See* Tenn. R. App. P. 3(e); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion). This issue is also waived because Defendant failed to present it as an issue in his brief's Issue Statement. Tenn. R. App. P. 27(a)(4); *Hodge*, 382 S.W.3d at 335 ("an issue may be deemed waived when it is argued in the brief but is not designated as an issue"); *State v. Barton Derek Grande*, No. W2002-01893-CCA-R3-CD, 2003 WL 22080782, at *2 (Tenn. Crim. App., at Jackson, Sept. 2, 2003) (defendant waived challenge to denial of a motion in limine where he failed to raise the issue in his motion for new trial).

Defendant does not allege that the trial court's failure to exclude the Y-STR evidence amounted to plain error; therefore, we decline to review the issue for plain error. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016) (providing that the defendant has the burden of establishing that the trial court committed plain error). We also note that the admissibility of DNA evidence is admissible pursuant to Tennessee Code Annotated section 24-7-117(b)(1), and any party may "offer[] proof that DNA analysis does not provide a trustworthy and reliable method of identifying characteristics in an individual's genetic material" and is free to "cross-examin[e] the other party's expert as to the lack of trustworthiness and reliability of such analysis." T.C.A. § 24-7-117(b)(2).

## III.     Improper Prosecutorial Comments During Closing Argument

In his last issue, Defendant claims the prosecutor mischaracterized the DNA evidence during the State's closing rebuttal argument. The State contends this issue is waived because Defendant failed to object contemporaneously at trial. The State also contends Defendant is not entitled to relief under plain error because no unequivocal rule of law was breached. Although Defendant did not lodge a contemporaneous objection, Defendant did challenge the State's closing argument as an issue in his motion for new trial. In terms of the standard of review, this court is aware that pending before the supreme court is *State v. Tyler Ward Enix,* No. E2020-00231-SC-R11-CD, 2021 WL 2138928 at *1

(Tenn. Crim. App., at Knoxville, May 26, 2021). The supreme court granted the defendant's application for permission to appeal on the issue of whether plenary or plain error review should apply to a claim of prosecutorial misconduct during closing argument when a contemporaneous objection is not lodged at the time the misconduct occurred but the issue is raised in a timely motion for new trial. Although we agree with the State that any review should be for plain error, we will address this issue under plenary review and plain error review. We find that under either standard of review, Defendant is not entitled to relief.

The majority of cases have held that the failure to lodge a contemporaneous objection during closing argument waives the issue on appeal. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010); *Banks*, 271 S.W.3d at 132 & n.30; *State v. Reid*, 164 S.W.3d 286, 344 n.3 (Tenn. 2005) (appendix); *State v. Reid*, 91 S.W.3d 247, 284 (Tenn. 2002); *United States v. Young*, 470 U.S. 1, 13 (1985) (Supreme Court applied plain-error to review improper closing argument claims where neither party made a timely objection to preserve the issue for review); *cf. State v. Hawkins*, 519 S.W.3d 1, 48 (Tenn. 2017) (plenary review applied to two instances of improper prosecutorial comment claims raised for the first time in motion for new trial in capital case).

"[C]losing argument is a valuable privilege that should not be unduly restricted." *State v. Bane,* 57 S.W.3d 411, 425 (Tenn. 2001). Closing argument gives each side the opportunity to persuade the jury of its theory of the case and to highlight the strengths and weaknesses in the proof. *Banks*, 271 S.W.3d at 130. The argument of an advocate must be temperate, predicated upon evidence introduced during the trial, and pertinent to the issues which must be resolved by the jurors. *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *Banks*, 271 S.W.3d at 131. "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id.* (citing *Young*, 470 U.S. at 11-13). Indeed, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.*

To evaluate the prejudicial impact of an improper prosecutorial argument, the following factors should be considered: (1) the conduct at issue in light of the facts and circumstances of the case; (2) any curative measures taken by the trial court and the State; (3) the prosecutor's intent in making the improper argument; (4) the cumulative effect of the improper argument; and (5) the relative strengths and weaknesses of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Courts also "take[ ] into account whether the improper remark of the prosecutor was made in response to the defendant's

comments or argument." *Id.*; *see also* Tenn. R. Crim. P. 29.1(c)(2) ("[t]he state's final closing argument is limited to the subject matter covered in the state's first closing argument and the defendant's intervening argument").

Here, Defendant contends the prosecutor's comment mischaracterized Agent Asbury's testimony because "[t]he type of testing performed does not distinguish between" DNA from skin cells or from bodily fluids. At issue are the following comments by the prosecutor during the State's closing rebuttal argument:

> They talk about the DNA, right? Talked a lot about the DNA. And they said, oh, well the DNA, you know, it can't be used against [Defendant]. Right? That's what they said. They talk about a bathroom, in a bathroom, being around her father at the home. Well, what was the testimony from (Special Agent) Terra Asbury this morning? You just heard it. What did she talk about? Did she test DNA on bodily fluids, on fluids that might have been in the bathroom? No, she didn't. She told you that she tested touch DNA. And she told you that she collected this DNA from the same area of clothing that [the victim] told you the Defendant's fingers went. The same area, the inside front. And what were her results? You heard them. You had one pair of underwear that on the inside front had the touch DNA that could not exclude [Defendant]. The DNA test on the inside front of the shorts had the DNA that could not exclude [Defendant]. It matched [Defendant]. Consistent with what [the victim] said.

Defendant did not object to this comment but raised it as an issue in his motion for new trial. In denying a new trial, the trial court emphasized "for the record" that Defendant posed no objection to the comment when it was made and found that the State's closing rebuttal argument was consistent with the proof. The prosecutor's comments fairly summarized Agent Asbury's testimony and directly responded to the defense's comments about the DNA evidence in the defense closing argument.

Furthermore, any issue with the accuracy of the prosecutor's statements was cured by the trial court's instruction to the jury that, "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Without evidence to the contrary, we presume that the jury followed this instruction. *State v. Banks,* 271 S.W.3d 90, 137 (Tenn. 2008) (prosecutor's comment that the victim begged for his life was not supported by the record but nevertheless did not rise to the level of plain error where jurors were instructed that the arguments of counsel are not evidence). This claim is without merit under plenary review.

- 23 -

For the same reasons, Defendant is not entitled to relief under plain error. The prosecutor's comment about the DNA evidence was supported by Agent Asbury's testimony. The trial court instructed the jury to disregard arguments of counsel unsupported by the evidence. These factors and the strength of the State's case, render this claim meritless under plain error review. For purposes of determining plain error, the prosecutor's comment did not undermine the evidence which fully supported Defendant's dual convictions for rape of a child. The proof shows that Defendant digitally penetrated the victim by sticking his finger underneath her shorts and underwear and "inside" her "private part," causing her pain. Defendant also grabbed the victim by the head and forced her to "suck" his penis. The DNA evidence found on the victim's clothes matched Defendant's profile. In the context of the State's closing argument and the strength of the State's case, the prosecutor's comment did not affect the verdict to warrant relief under plain error. Thus, his right to a fair trial was not adversely affected and he is entitled to no relief.

## IV. Sufficiency of Evidence

Defendant's issue regarding the sufficiency of evidence is waived because he has provided no argument or citations in support of this issue. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7). Accordingly, it is waived. Waiver notwithstanding, from this proof, we conclude a rational juror could find that Defendant did intentionally, knowingly or recklessly engaged in unlawful sexual penetration of the victim and of unlawful sexual penetration of the Defendant by the victim who was more than eight years of age by less than thirteen years of age in violation of Tennessee Code Annotated section 39-13-522. Defendant is not entitled to relief.

## CONCLUSION

Based on foregoing analysis, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE

- 24 -